# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

KEITH MILLER, individually and
on behalf of all other similarly
situated individuals,

     Plaintiff,

v.

FLEETCOR TECHNOLOGIES
OPERATING COMPANY, LLC,

     Defendant.

§
§
§
§
§
§
§
§
§
§
§

CIVIL ACTION NO. 1:13-cv-
2403-SCJ

## DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION FOR DECERTIFICATION

# <u>TABLE OF CONTENTS</u>

**PAGE**

I.    INTRODUCTION AND SUMMARY OF ARGUMENT ............................ 1

II.   FACTUAL BACKGROUND ........................................................................ 2

    A. Overview ......................................................................................... 2

    B. Inbound Sales Representatives and Outbound
       Sales Representatives ....................................................................... 3

    C. 2011 Reclassification of Inbound and Outbound
       Sales Representatives ....................................................................... 4

    D. Plaintiffs' Overtime Claims .......................................................... 6

III.  LAW AND ARGUMENT ......................................................................... 7

    A. At the Decertification Stage, the "Similarly Situated"
       Standard Is More Rigorous and Plaintiffs Bear a
       Heavier Burden ............................................................................... 7

    B. Plaintiffs Cannot Satisfy Their Heavy Burden of Proving
       They Are Similarly Situated Because Numerous Disparate
       Factual and Employment Settings Exist ...................................... 8

       1.  Individual determinations regarding liability are
           required .................................................................................. 9

       2.  The day-to-day job duties of Inbound and Outbound
           Sales Representatives differ in material ways .................... 12

       3.  Plaintiffs were subject to different compensation
           schemes ................................................................................ 16

       4.  Plaintiffs' respective managers had varying policies
           and practices ........................................................................ 18

5.  Plaintiffs have offered differing explanations and
    times for working additional hours.................................................. 23

C. Numerous Individualized Defenses Exist that Are Not
   Uniformly Applicable to the Collective Class.......................................... 26

    1.  Defenses to liability and damages require
        individualized analyses..................................................... 26

    2.  Some Plaintiffs' claims are time-barred ............................. 27

    3.  Some Plaintiffs are estopped from recovery due to
        pending bankruptcies ....................................................... 28

    4.  Serious credibility issues plague some of the Plaintiffs .................... 29

    5.  Additional defenses are available against certain
        Plaintiffs......................................................................... 31

D. Fairness and Procedural Considerations Require
   Decertification............................................................................ 33

    1.  Representative evidence cannot fairly establish
        liability ........................................................................... 34

    2.  Representative evidence cannot fairly establish
        damages........................................................................... 36

IV.   CONCLUSION ............................................................................... 39

CERTIFICATE OF SERVICE............................................................. 40

PD.14448910.1

## I.   <u>INTRODUCTION AND SUMMARY OF ARGUMENT</u>

Plaintiff Keith Miller brings this conditionally-certified collective action on behalf of himself and 78 opt-in Plaintiffs to adjudicate all of their alleged unpaid overtime claims in a single proceeding. Here, the employment circumstances of the collective action members, the multiple legal theories implicated, and the individualized nature of the inquiries prevent this case from being fairly litigated as a collective action consistent with due process.

The record evidence obtained thus far reveals material differences among the opt-in Plaintiffs relating to their proof of claims and damages. Among other things, opt-in collective action members worked under a variety of different managers and team leads (collectively, "managers") and were subject to different compensation schemes, while working in two distinct job positions during varying time periods. Plaintiffs' claims are also subject to a variety of individualized defenses, including statute of limitations defenses. Accordingly, representative evidence is inappropriate to prove liability and damages on a class-wide basis. If maintained as a collective action, this case will inevitably degenerate into an unmanageable multitude of mini-trials over each Plaintiff's particular claim, which is the antithesis of a collective action. Thus, this Court should decertify the conditionally-certified collective action.

## II.  **FACTUAL BACKGROUND**

### A.  **Overview**

FleetCor operates a global network that provides benefits associated with the purchase of fuel and maintenance services, as well as other services. (Citarella 13-15)  FleetCor's headquarters are located in Norcross, Georgia. (Citarella 16) Among other types of sales employees, FleetCor currently employs approximately 180 Inbound and Outbound Sales Representatives to sell its products and services from inside FleetCor's Norcross offices. (Citarella 19-21; Citarella Exhs. 2-3) Prior to March 2012, FleetCor's Inbound and Outbound Sales Representatives worked in two different buildings (approximately 2 miles from each other). (Citarella Decl. ¶ 8; Citarella 52)  In March 2012, all Inbound and Outbound Sales Representatives moved to the same building, although some later moved to the Metric building. (Citarella 39-40; Citarella Decl. ¶ 8; Miller 21-22)

Seventy-eight of the 79 Plaintiffs in this action worked for FleetCor as either Inbound Sales Representatives and/or Outbound Sales Representatives at some point since 2009.[1]

---

[1] Sandra Siddell worked for Discrete Wireless, Inc. d/b/a NexTraq (which was acquired by FleetCor Technologies, Inc. in late October 2013). (Citarella Decl. ¶ 17)  Siddell never worked as an Inbound or Outbound Sales Representative. (Citarella Decl. ¶ 17)

2

**B.**   **Inbound Sales Representatives and Outbound Sales Representatives**

Inbound Sales Representatives and Outbound Sales Representatives perform distinct jobs. (Miller 33-37; Citarella 20)  Inbound Sales Representatives primarily sell FleetCor's products and services through incoming calls and "warm leads," whereas the Outbound Sales Representatives primarily sell through cold calling, networking and referrals. (Citarella 64-65)   As a result, the Inbound Sales Representative position generally is considered less demanding than the Outbound Sales Representative position. (*See* Miller 34, 110)

Inbound and Outbound Sales Representatives are assigned to different teams. (Citarella 22; Miller 13)  During the relevant period, there were 2 to 4 (depending on the time period) Inbound Sales Representative teams (divided primarily based on the source of the leads) and at least eight Outbound Sales Representative teams (generally divided based on the product being sold). (Citarella Decl. ¶ 9; Citarella 28-33)  Each team has a different manager who is responsible for administering and enforcing FleetCor's policies and practices, including its overtime policies and time reporting policies. (Citarella Decl. ¶ 10; Citarella 22, 27, 33-35)  Many Plaintiffs worked on more than one team and under

the supervision of several different managers during the course of their employment. (Miller 13, 17; Green 14-18; Citarella Decl. ¶ 10)[2]

## C.     2011 Reclassification of Inbound and Outbound Sales Representatives

Before the positions of Inbound and Outbound Sales Representatives came into existence, FleetCor's sales occurred through "Field Sales" employees who sold from outside FleetCor's office. (Citarella 63-64, 118, 137)  These Field Sales employees were and continue to be paid on a salary-plus-commissions basis and are classified as exempt under the FLSA. (Citarella Decl. ¶ 6)

At some time prior to 2009, FleetCor decided to move some of the Field Sales employees inside FleetCor's office and created the Inbound and Outbound Sales Representative positions. (Citarella Decl. ¶ 7)  FleetCor continued to pay these sales employees in the same manner and continued to classify them as exempt under the FLSA. (Citarella 117-18)  Accordingly, FleetCor did not track the hours worked by Inbound and Outbound Sales Representatives during this exempt time. (Citarella 121)  Regardless of the classification, FleetCor considered

---

[2] The Inbound and Outbound Sales Representatives were expected to work no more than 40 hours in a workweek. (Citarella Decl. ¶ 14; Citarella 124, 134-35, 149)  The Inbound and Outbound Sales Representatives generally worked 8 a.m. to 5 p.m. with a one-hour lunch break, with some modified schedules (shift start and stop times) for those who were assigned territories on the West Coast and those with special circumstances. (Citarella 80-81, 96; Miller 19; Green 18)

4

the position to be "a true 40 hour-a-week" job. (Citarella 124)[3] In 2011, FleetCor

evaluated and decided to compensate the Inbound and Outbound Sales

Representatives on an hourly basis and classify them as non-exempt, beginning in

May 2011. (Citarella 122-23, 128-29, 149-50; Miller 73-74, Miller Exh. 6)

In anticipation of the change in compensation from salary to hourly,

management met with all Inbound and Outbound Sales Representatives to explain

the change and emphasize the proper timekeeping practices and procedures.

(Miller 73-74; Citarella 123-24, 127, 130-32; Citarella Exh. 4)   FleetCor

specifically instructed them to "[w]ork 40 hours per week," and **not** to work extra

hours without pre-approval from their manager. (Citarella 134-35; Citarella Exh. 4)

FleetCor also instructed its managers about the proper practices and procedures

regarding timekeeping and overtime. (Citarella 150-52; Green 76, Green Exh. 3)

Specifically, managers were instructed to now submit their employees' hours

worked bi-weekly. (Citarella ¶ 11; Citarella Exh. 5)   Pursuant to written policy,

employees were expected to complete a timesheet accurately reflecting all hours

worked, including overtime hours, and to submit it to their manager. (Miller Exhs.

2-6)   However, in practice, the managers reported the hours worked by their

---

3 In fact, when FleetCor changed the compensation from salary to hourly, it set
the hourly rate by dividing the salary of each employee by 2080 hours (40 hours x
52 weeks), and not some higher number of hours. (Citarella 124)

employees based on their visual observations of when the employees worked. (Citarella 131-32)

In July 2013, FleetCor took measures to ensure compliance with its written policy that non-exempt employees complete and submit their own timesheets, which they began doing as of July 29, 2013. (Miller Exhs. 5-6; Citarella 139-44; Citarella Exhs. 6 and 8-9) In connection with this change, FleetCor sent a notice to all Inbound and Outbound Sales Representatives, reminding them to accurately report all time worked on the timesheet and, again, instructing them not to perform work outside of their normal, 40-hour work schedule without prior approval from management. (Citarella Exh. 8)

## D.   <u>Plaintiffs' Overtime Claims</u>

Plaintiffs allege overtime claims that vary from one another considerably. Miller claims overtime based solely on alleged additional hours worked in FleetCor's office, and he denies he is seeking overtime pay for working on nights or weekends. (Miller 63-64)  By contrast, Tisha Green claims (at least in part) she worked overtime outside of FleetCor's offices, including on nights and weekends. (Green 47-48, 67-70)  Some Plaintiffs claim they did not work overtime after the Fall of 2013, but other Plaintiffs claim they continued working overtime after the Fall of 2013. (*Compare* Miller 76-77, 81-82, 107; Exh. 7, pp. 90, 139, 148, 221,

254, 263, 279, 329, 346, 433 *with* Exh. 7, pp. 4, 22, 49, 75, 84, 181, 197, 205, 213, 246, 287, 296, 305, 320, 363, 415, 441)   At least one other Plaintiff, Douglas Jones, claims he did not work overtime after the Fall of **2012**. (Exh. 7, p. 165)   In addition, Plaintiffs allege, on an individual basis, a varying number of alleged overtime hours worked, depending on the time period in question. (*See id.*)   For example, Alan Kipping claims he worked 10 hours per week of overtime until 2011, but only 3 hours thereafter. (Exh. 7, p. 197)

### III.   LAW AND ARGUMENT

**A.**   **At the Decertification Stage, the "Similarly Situated" Standard Is More Rigorous and Plaintiffs Bear a Heavier Burden.**

To maintain a collective action under the FLSA, plaintiffs must show they are "similarly situated."   Under the two-tier approach adopted by the Eleventh Circuit, plaintiffs' burden at the **first** stage is "fairly lenient." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1261 (11th Cir. 2008).   By the **second** stage of the similarly-situated analysis, however, plaintiffs must meet a stricter standard because the court "has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." *Id.*   In order to avoid decertification and proceed with a collective action, plaintiffs have a heavier burden to show similarities "beyond the mere facts of job duties and pay provisions." *Anderson v. Cagle's, Inc.*, 488 F.3d 945, 953 (11th Cir. 2007)

(citations and internal quotations omitted).  Otherwise, doubt exists as to whether "§ 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." *Id.* (internal citations omitted).

At the decertification stage, whether plaintiffs are similarly situated is determined by analyzing: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that are individual to each plaintiff; and (3) fairness and procedural considerations. *Id.* "Logically the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." *Id.*

**B.** **Plaintiffs Cannot Satisfy Their Heavy Burden of Proving They Are Similarly Situated Because Numerous Disparate Factual and Employment Settings Exist.**

While Plaintiffs all worked in inside sales positions, significant distinctions exist among Plaintiffs' factual and employment settings.  During the relevant time period, Plaintiffs held two distinctly different sales jobs, had different compensation schemes, and worked for different teams under various different managers.  Liability determinations will necessarily turn on Plaintiff-specific facts, such as what position(s) the particular Plaintiff held, which compensation and commission scheme(s) they were under, and whether their specific managers knew

8

or should have known whether the particular Plaintiff worked over 40 hours in a workweek.

### 1.   Individual determinations regarding liability are required.

"To satisfy the 'similarly situated' standard regarding a collective action, Plaintiffs must establish, *inter alia*, **liability** on a class-wide basis." *Rindfleisch v. Gentiva Health Services, Inc.,* 2014 WL 2002834, *5 (N.D. Ga. Apr. 18, 2014) (Jones, J.) (citation and internal quotations omitted) (emphasis in original). Certification is inappropriate where liability determinations can be made as to only some Plaintiffs, but not all.

*Rindfleisch v. Gentiva Health Services, Inc.,* is instructive.  In *Rindfleisch,* this Court decertified a collective action because the evidence revealed some members of the collective class did not work over 40 hours in a workweek.  As aptly stated by this Court:

> [t]he fact that some Plaintiffs did not actually work overtime hours, creates a disparate factual setting among the individual Plaintiffs as the issue of liability is not susceptible to common proof.  Put more simply, the Court cannot envision a more pertinent disparate factual setting, for purposes of the similarly situated inquiry, among a group of Plaintiffs than the fact that some members of the group do not actually have a viable claim in the action at issue.

*Id.,* *5.  This Court concluded that the action must be decertified, as plaintiffs failed to establish class-wide liability, and thus, were not similarly situated.

PD.14448910.1

The same result is warranted here.  Record evidence demonstrates that, given the individualized determinations required, there cannot be liability as to all collective class members.  As an example, Janice Gardner worked for FleetCor for only **one** day, August 15, 2011. (Citarella Decl. ¶ 18)  Thus, Gardner could not have worked a full 40-hour workweek, let alone over 40 hours.  Sandra Siddell did not begin working for FleetCor until October 21, 2013, over two months **after** the cut-off date set forth in the collective action definition. (Citarella Decl. ¶ 17) Stacey Green and Tara Gray have no viable claim for overtime damages because their claims are barred by the FLSA's three-year statute of limitations. (Citarella Decl. ¶ 19; Doc. 20, 105)[4]

Moreover, some of Plaintiffs' sworn discovery responses indicate they did not work more than 40 hours a week during the relevant period.  For example, Kenneth Williams identifies Kenneth Matthews as the manager who directly supervised him when he allegedly worked overtime.  (Exh. 7, pp. 424-25) However, Matthews only supervised Williams from June 2008 through December

---

[4] As discussed more fully in Section III(C)(2), at least ten other Plaintiffs may not have a viable claim because their claims are barred by the two-year statute of limitations period (Kenyatta Alexander, Cozette Bond, Tamara Echols, Christina Graham, Dawn Jackson, Harold Odister, Kerry Patton, Andre Smith, Jeannine Townsend-Coates and Jack Watson ). (Citarella Decl. ¶ 19; Doc. 9, 33-34, 94, 98, 106, 109, 113)

PD.14448910.1

2009. (Citarella Decl. ¶ 20)  Williams did not opt into this action until August 27, 2013, more than three years after he worked for Matthews. (Doc. 25)[5]  Even Miller acknowledged that some of the other Outbound Sales Representatives may not have worked over 40 hours in a week. (Miller 113)

One of the metrics used to assess the performance of the Inbound and Outbound Sales Representatives was their call log activity. (Citarella 85-86, 98)[6] Analysis of liability and damages will necessarily involve evaluation of this call log activity on an individualized basis, with individualized explanations by Plaintiffs and FleetCor as to whether the data shows Plaintiffs failed to work any overtime, much less the overtime hours they claimed.

As these examples show, Plaintiffs cannot be similarly situated for purposes of a collective action because individual determinations regarding liability must be made.   Furthermore, numerous Plaintiffs do not actually have a viable claim for overtime damages, precluding Plaintiffs from establishing actual liability on a

---

[5]Williams also identifies John Thomas and Paul Citarella as individuals who supervised him when he allegedly worked overtime. (Exh. 7, p. 424)  However, Thomas, the Vice President of Outbound Sales, and Citarella, the Senior Vice President of Sales and Marketing, are both upper-level executives who never served as Williams' manager while he was an Outbound Sales Representative. (Citarella Decl. ¶ 20; Citarella 11, 16)

[6] At the start of their day, Plaintiffs logged into a system called GADD, which is a software-based phone system that tracks the call activity for each Inbound and Outbound Sales Representative. (Citarella 81-82)

class-wide basis.  As a result, this action must be decertified.  *See Rindfleisch,* 2014 WL 2002834, *5; *Wallace v. Norcross Associates, LLC,* 2014 WL 1373659, *4 (N.D. Ga. Apr. 8, 2014) (denying plaintiffs' motion for conditional certification because, *inter alia,* individualized assessments would be required to determine liability).

### 2.    The day-to-day job duties of Inbound and Outbound Sales Representatives differ in material ways.

While the jobs of Inbound and Outbound Sales Representatives involve telephone sales, the Inbound and Outbound job duties differ in a number of material ways.   These differences create variations in key work practices as well as in the employees' respective workloads. (Citarella 20-21, 64-65, 98-99; Citarella Exhs. 2-3)

The Inbound Sales Representatives make their sales through incoming inquiries prompted by marketing materials sent out by FleetCor ("warm leads"). (Miller 34; Citarella 64-65; Citarella Exh. 2)  Within Inbound Sales, separate teams exist based on the source of the sales lead. (Citarella 22-23)  During the relevant period, there were 2 to 4 (depending on the time period) Inbound Sales Representative teams, all with different managers. (Citarella 22-23, 26-27; Citarella Decl. ¶s 9-10)

Because Inbound Sales Representatives receive "warm" leads, their position is considered "less challenging" than Outbound Sales Representative (and, according to Miller, is less likely to ever require overtime work). (Citarella Decl. ¶ 9; *see* Miller 34, 109-110)   Inbound Sales Representatives are expected to make fewer calls per day and leads are considered to be easier sales that are less likely to involve "late" or overtime work. (Citarella 98-99; Miller 34, 109-10)   In Miller's words, "[t]hey're getting handed leads, so they don't have to work as hard." (Miller 110)   Also, they did not need to self-prospect, since they were not responsible for generating leads.  (Citarella Decl. ¶ 4)   Contrast this lack of self-prospecting with opt-in Green's claim that she worked overtime by "self-prospecting" on nights and weekends. (Green 47-48, 67-70)

Outbound Sales Representatives primarily sell FleetCor's products and services through unsolicited calls ("cold calling") to prospective clients, and so they are typically more experienced sales persons. (Citarella 64-65; Citarella Exh. 3)   They are expected to make more calls per day than Inbound Sales Representatives. (Citarella 98-99)   According to Miller, Outbound Sales Representatives "work a little harder," and it is more difficult for them to earn commissions. (Miller 34-35)

Even among the Outbound Sales Representatives, additional distinctions exist in particular job duties and work practices.  Specifically, Outbound Sales Representatives were assigned divergent sales territories, some in different time zones. (Citarella Decl. ¶ 5; Green 49)  For example, some were assigned territories on the West Coast. (Green 49; *see* Citarella 81)  While the work schedule of these Outbound Sales Representatives was adjusted to account for the different time zones, some evidence suggests that the West Coast territories may trigger more "after hours" than other territories. (*See* Green 49)  Tisha Green testified she would work until 6:00 p.m. "because I wanted to hit the West Coast." (Green 67)  At least five other Plaintiffs also claim they worked late to service West Coast clients, while the remaining Plaintiffs do not claim additional hours in connection with West Coast accounts. (Exh. 7, pp. 49, 78, 133, 191, 365)

Outbound Sales Representatives are also divided into different teams based on the product being sold. (Citarella 22, 28-33)  During the relevant period, there were at least eight Outbound Sales Representative teams, all with different managers. (Citarella Decl. ¶ 9; Citarella 22, 33-35)   Some Outbound Sales

14

Representatives worked on numerous teams during their employment. (Miller 17; Green 13-17; Citarella Decl. ¶ 10)[7]

Production goals varied from team to team. (Miller 39-40)  Miller described some sales goals as "achievable" and others as "unachievable" and "outrageous." (Miller 40)  Miller claimed that employees in teams with unachievable quotas had to stay late to try and meet quota. (Miller 90)  As a result, employees assigned to teams with relatively high quotas would have been more likely to work additional hours than those assigned to less demanding teams.  (*See* Miller 90)

These numerous, material differences in Plaintiffs' day-to-day job duties weigh strongly in favor of decertification.  *See Desilva v. North Shore-Long Island Jewish Health System, Inc.,* 2014 WL 2534833, *1 (E.D. N.Y. June 5, 2014) (decertifying collective class of employees because, *inter alia,* "Plaintiffs' job duties differed and their compensation – or lack thereof – for overtime work performed during meal breaks likewise differed accordingly"); *Knott v. Dollar Tree Stores, Inc.,* 897 F.Supp.2d 1230 (N.D. Ala. 2012) (decertifying collective class because of, *inter alia,* differences in amount and type of work performed); *see also Reich v. Homier Distributing Co., Inc.,* 362 F.Supp.2d 1009, 1014 (N.D. Ind. 2005) (denying plaintiff's request to expand suit into collective action where

---

[7] Miller worked on approximately six different teams. (Miller 17)

"all of the potential plaintiffs shared the same position but had differing job duties").

### 3.     Plaintiffs were subject to different compensation schemes.

In addition to the divergent job duties, the Inbound and Outbound Sales Representatives were subject to different compensation schemes.  In *Wallace v. Norcross Associates, LLC*, this Court refused to conditionally certify a collective class because, *inter alia*, plaintiffs were compensated in different manners at different times under highly complex and varying commission schemes.   In support of its conclusion, this Court emphasized:

> the method of calculating unpaid overtime wages or commissions would differ among class members depending on how they were compensated, preventing the Court from coming up with a common formula that could be used to calculate damages for each Plaintiff . . . . Furthermore, each person paid by commission would have earned at a different rate depending on their sales.  Some class members would even require multiple calculations if they were paid under different compensation schemes over the course of their employment.

*Wallace,* 2014 WL 1373659, *4.

As in *Wallace,* Plaintiffs were compensated under varying compensation schemes and at different times.  As mentioned, until May 2011, the Inbound and Outbound Sales Representatives were paid on a salary basis plus commissions, after which FleetCor began paying them on an hourly basis plus commissions. (Citarella 122-123)  Some Plaintiffs were only employed during the salary-basis

16

period, others were only employed during the hourly-basis period, and still others were employed during both periods. (*E.g., compare,* Exh. 7, pp. 31, 181, 238, 263, 329, 355, 441 (hourly basis only), *with* Exh. 7, pp. 4, 40, 75, 106, 157, 165, 197 (salary and hourly basis), *and* Exh. 7, pp. 13, 123, 337 (salary basis only))

In addition, although the Inbound and Outbound Sales Representatives were eligible for commissions based on the amount of fuel they sold, the commission structure varied between the Inbound and Outbound groups. (Miller 34)    In particular, the quotas and amounts of commissions varied significantly.   (Miller 34-35; Citarella 115-16)

As a result of Plaintiffs varying commission schemes, their respective overtime calculations, if any, also differ substantially and prevent this Court from applying a common formula to calculate damages for the collective class. Furthermore, for each Plaintiff who was paid under different compensation schemes over the course of their employment, the Court would have to perform multiple, separate calculations just to develop that individual's damages.  For these reasons, continuing this case as a collective action would not aide in the resolution of common issues of law or fact.  *See Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770, 773-74 (7th Cir. 2013) (affirming decertification because of "difficulty of computing the damages for each collective class member," and noting that

17

calculation of damages would not be a "mechanical, formulaic" task); *Wallace,* 2014 WL 1373659, *4; *Tussing v. Quality Resources, Inc.,* 2009 WL 4350253 (M.D. Fla. Nov. 25, 2009) (refusing to conditionally certify collective class because collective class members included non-exempt and exempt employees and "pay provisions for hourly and commissioned rates vary greatly dependent not only upon types of sales and job title, but also upon particular shift worked").

**4.    Plaintiffs' respective managers had varying policies and practices.**

Plaintiffs have failed to identify (because there is none) any uniform policy or practice that required **all** Inbound or Outbound Sales Representatives to work more than 40 hours in a workweek without overtime pay.   To the contrary, Plaintiffs' claims for overtime pay arise from their varying stories of differing instructions by different managers regarding how long to work, whether to leave, whether to self-prospect on off time, and so forth.

In *Reed v. Mobile County School System,* 246 F.Supp.2d 1227 (S.D. Ala. 2003), the court found that the plaintiffs were not similarly situated due to their varying decision-makers:

> Absent some showing that principals, supervisors and others involved in decisions involving overtime compensation operate in lockstep, the denial of overtime compensation by one decisionmaker does not readily suggest similar denials by other decisionmakers, even those operating at the same location.

18

*Reed,* 246 F.Supp.2d at 1233; *see also Illano v. H & R Block Eastern Enterprises,* 2010 WL 9553051, \*3-4 (S.D. Fla. Nov. 4, 2010) (decertifying collective action because evidence suggested lack of uniform policy and, even if plaintiffs could have demonstrated a unifying plan, enforcement of such plan varied among district managers and Office Leaders).

Here, the evidence defies any kind of "lockstep" pattern by the managers. Instead, discovery revealed vast differences among Plaintiffs in terms of claimed hours worked. Plaintiffs claim overtime hours ranging from 20 hours per week throughout their entire employment to half an hour per week. (Exh. 7, pp. 380, 205)   The managers, who were responsible for administering and enforcing FleetCor's overtime and time reporting policies, did not do so in the same way. (Citarella Decl. ¶ 12)   For example, some managers maintained fairly detailed electronic and paper calendars on which they tracked the attendance of their employees. (Citarella Decl. ¶ 12; Coleman Decl. ¶ 7; Rivera Decl. ¶ 7)   Other managers did not maintain such calendars. (Citarella Decl. ¶ 12)

Some managers allowed their employees to make up hours for late arrivals or early departures, also resulting in divergent policies and practices. (Citarella Decl. ¶ 13; Coleman Decl. ¶ 6; Rivera Decl. ¶ 7)   For instance, Lester Rivera, a manager for the Web (Inbound) team, allowed his employees to make up hours if

they missed a relatively small amount of time. (Rivera Decl. ¶ 7)  However, if the tardiness or early departure was significant, Rivera would usually note the lost time on the time record he provided to payroll. (Rivera Decl. ¶ 7)  By contrast, Kimberley Coleman, the Team Lead for a BP (Outbound) team, allowed employees under her supervision to make up only two hours per week. (Coleman Decl. ¶ 6)  If their missed time exceeded two hours, Coleman required the employees to use any accrued personal time for those additional hours. (Coleman Decl. ¶ 6)  If employees stayed late to make up hours, Coleman required the employees to email her when leaving the office and Coleman would also check the call log activity for the employees the following day to ensure the employees had worked. (Coleman Decl. ¶ 6)

Managers also had different policies and practices with regard to "Early-Outs." (Citarella Decl. ¶ 13; Coleman Decl. ¶ 11; Rivera Decl. ¶ 11)  "Early-Outs" was a program in which Inbound and Outbound Sales Representatives were allowed to leave work several hours early (usually on a Friday), but were paid for the entire day as a reward for meeting certain sales goals. (Miller 59-63)  Thus, the Early-Outs directly affected the possibility of overtime hours being worked.  Early-Outs were "totally up to the manager." (Green 72)  Some managers allowed Early-Outs to an individual employee who achieved a particular goal; others allowed

Early-Outs on a group basis when a team achieved a particular goal. (*See* Coleman Decl. ¶ 11; Rivera Decl. ¶ 11; Miller 60)  Some managers allowed employees to leave two hours early for an Early-Out, while others allowed employees to leave four hours early. (*See* Miller 59-63; Coleman Decl. ¶ 11)

The frequency of Early-Outs also varied among the managers. (Miller 61-62; Green 73; Coleman Decl. ¶ 11; Rivera Decl. ¶ 11)  Miller and Green claimed they were usually allowed an Early-Out only every other month, but Miller said Popov allowed him three Early-Outs in a row. (Miller 61-62; Green 73) Likewise, managers' practices varied considerably with Lunch and Learn meetings for their teams. (*Compare* Coleman Dec. ¶ 10 *with* Rivera Dec. ¶ 10)

Importantly, while there is no uniform policy or practice that required Inbound or Outbound Sales Representatives to work more than 40 hours in a workweek, some Plaintiffs claim that certain managers encouraged them to work additional hours, yet others contend these same managers did **not** encourage them to work additional hours.[8] (*E.g.,* Exh. 7, pp. 131, 133, 271, 273, 313, 315, 320,

---

[8] For example, Chett Role, who identified his managers as Nikolav Popov, Lolu Adewakun and John Thomas, claimed Thomas was the only individual who encouraged him to work additional hours. (Exh. 7, pp. 313, 315)  However, Yvonne Stanford, who also identified Popov, Adewakun and Thomas as individuals she worked under during her employment, claimed all three encouraged her to work late on a daily basis. (Exh. 7, p. 320, 322)

PD.14448910.1

322)    Plaintiffs also seem to absolve some managers of any responsibility altogether for alleged unpaid overtime.   For instance, not a single Plaintiff indicates that Stephanie Frank, the manager of a BP (Outbound) team, ever encouraged overtime work. (*See* Exh. 7, pp. 205, 207, 293-301)

The vast differences between the managers are further exemplified by the testimony of Miller who stated that the work pressures varied between the managers. (Miller 42)  Miller testified that Matthews, who supervised Miller for several months in early 2013, was more "laid back" than his other managers. (Miller 42-43)  Miller did not identify Matthews as one of the managers for whom he worked overtime.[9] (Miller Exh. 8)

The managers of a particular team may change multiple times. (Green 15-16)  As a result, an employee who only worked on one team, may still have been subject to the supervision of multiple managers. (*See* Green 15-16)

As these examples demonstrate, a determination on the merits is not susceptible to generalized proof in light of the varying policies and practices of the different managers.  Individualized inquiries regarding the conduct of individual

---

[9] As mentioned, Miller worked under at least three different managers or team leads during his employment, and Tisha Green testified that she worked under two different managers or team leads. (Green 15) Shawn Collins identified five different individuals whom she worked under during her employment, and Joellyn Williams identified six. (Exh. 7, pp. 75, 415)

managers toward the individual Plaintiffs are necessary, and thus decertification is warranted. *See Hilley v. Tacala, L.L.C.,* 2014 WL 1246364, *15 (N.D. Ala. Mar. 24, 2014) (denying motion for conditional certification because violations are "isolated and/or sporadic violations of defendant's written policies, and the decisional sources are individual store managers and not company-wide decisionmakers"); *Zulauf v. Amerisave Mortgage Corp.,* 911 F.Supp.2d 1266, 1274-75 (N.D. Ga. 2012) (granting motion to decertify collective class because there was no top-level policy to violate the FLSA; at most, evidence showed that some, but not all, managers instituted or encouraged a FLSA-violating policy); *Epps v. Oak Street Mortgage LLC,* 2006 WL 1460273, *7 (M.D. Fla. May 22, 2006) (granting, in part, defendant's motion to decertify collective class because, *inter alia,* even if defendant had a corporate policy of discouraging overtime, "proof of a violation will be individualized because it depends upon how or whether each individual manager implemented the policy with regard to each individual plaintiff").

## 5.   Plaintiffs have offered differing explanations and times for working additional hours.

Plaintiffs provide a wide range of dissimilar reasons why they allegedly worked additional hours and when such alleged additional hours were worked, further refuting any common, company-wide policy or plan.   Courts have

23

recognized that such disparities are enough to warrant decertification.   For example, in *Velasquez v. HSBC Finance Corporation,* 266 F.R.D. 424 (N.D. Cal. 2010), one plaintiff stated she worked off the clock because she felt compelled to complete her work and "couldn't leave . . . things unfinished." *Velasquez,* 266 F.R.D. at 429.  Another plaintiff wanted to maximize his bonus compensation. *Id.* at 430.  Other plaintiffs gave different reasons, such as wanting to avoid their hours being cut or wanting to stay off "the company radar." *Id.* at 429-30.  Plaintiffs' diverse reasons for working off the clock led the court to deny conditional certification because plaintiffs were not the victims of a single decision, policy or plan. *Id.* at 430-31; *see also Zulauf,* 911 F.Supp.2d at 1274-75 & n.11 (decertifying collective action on ground that plaintiffs failed to show top management created and enforced policy of under-reporting hours and noting that plaintiffs' varying reasons for violating overtime policies and under-reporting hours "affirmatively demonstrates that these SMPs [plaintiffs] are not similarly situated"); *Illano,* 2010 WL 9553051, *4 (decertifying collective action and finding that plaintiffs could not demonstrate claims for overtime payment emanated from uniform plan, as plaintiffs had different reasons for working off the clock).

The same is true here.  Some Plaintiffs indicated their managers encouraged them to work additional hours, and others say the opposite.[10]  (Exh. 7, pp. 131, 133, 271, 273, 313, 315, 320, 322)   Some Plaintiffs claim additional hours via skipped or shortened lunches, while others, like Miller, claim to have regularly taken a one-hour lunch. (Green 61; Miller 52; Exh. 7, pp. 157, 287, 374, 409) Further, Miller claimed to have performed the overtime work solely at the office, while Green contends she worked additional hours self-prospecting before and after work and on the weekends. (Green 47-48, 67-70; Miller 63-64)   Pascha Rankins claims she was encouraged to make sales calls from her home or car. (Exh. 7, pp. 298-99)

This lack of uniformity on central issues – whether, when, and why Plaintiffs performed alleged unpaid overtime work – renders decertification essential in this case.

---

[10]  For example, William Lewis, Kerry Patton, Joellyn Williams and Tamara Echols, among others, admitted that no one ever encouraged them to work additional hours.  (Exh. 7, pp. 100, 207, 273, 417)   Some Plaintiffs alleged they worked additional hours in order to get their work done, others alleged they worked additional hours because they believed they would be terminated or subject to disciplinary action if they did not meet their sales quotas, and still others state that they worked additional hours to service West Coast accounts.  (Exh. 7, pp. 15, 49, 78, 117, 133, 191, 199, 215, 365, 391, 417)

C.  **Numerous Individualized Defenses Exist that Are Not Uniformly Applicable to the Collective Class.**

The second factor considered in determining whether collective treatment is appropriate is whether the potential defenses relate to the collective class as a whole or to an individual plaintiff(s). *Anderson,* 488 F.3d at 953 (citation omitted). "As a practical matter, the availability of defenses to some but not all of the putative class members 'clearly poses significant case management concerns.'" *Id.* at 954 n.8 (citation omitted).  Here, FleetCor has numerous defenses that apply to some, but not all, of the individual Plaintiffs.

1.  **Defenses to liability and damages require individualized analyses.**

Plaintiffs cannot establish liability and damages on a class-wide basis.  To establish liability, Plaintiffs must prove that FleetCor "suffered or permitted" each Plaintiff to work more than 40 hours (without overtime pay), which means that Plaintiffs must "demonstrate that each individual manager [who supervised plaintiffs] had actual or constructive knowledge that plaintiffs were performing . . . work without proper compensation." 29 U.S.C. § 207; 29 C.F.R. § 785.11; *Reich v. Dept. of Conservation and Natural Resources, State of Ala.*, 28 F.3d 1076 (11th Cir. 1994); *Tracy v. NVR, Inc.*, 293 F.R.D. 395, 399 (W.D.N.Y. 2013) (decertifying collective class because proof of manager knowledge of overtime worked required individualized testimony from every manager).   Individual

26

testimony of managers, as well as individual employee data, including call log activity data, will be required for FleetCor to refute liability and damages.

Plaintiffs' own discovery responses refute class-wide proof of manager knowledge, as some Plaintiffs accuse particular managers of having knowledge of unpaid overtime, while others absolve those same managers of responsibility for alleged unpaid overtime.  (Exh. 7, pp. 131, 133, 271, 273, 313, 315, 320, 322)

With respect to damages, discovery revealed vast differences in the hours Plaintiffs claim they worked and the time period in which they allegedly worked overtime.  Plaintiffs claim overtime hours ranging from 20 hours per week to half an hour per week; some claim they ceased working overtime in Fall 2013; some claim they continued to work overtime hours after that time. (Miller 76-77, 81-82, 107; Exh. 7, pp. 4, 22, 49, 75, 84, 90, 139, 148, 181, 197, 205, 213, 221, 246, 254, 263, 279, 287, 296, 305, 320, 329, 346, 363, 380, 415, 433, 441) FleetCor will need to offer individualized evidence to refute the varying damages claims of each Plaintiff.

## 2.  Some Plaintiffs' claims are time-barred.

Another individualized defense is that many, but not all, of Plaintiffs' claims are barred by the statute of limitations.  The default limitations period is two years, but it may be extended to three years if a plaintiff can prove the alleged FLSA

PD.14448910.1

violation was willful.  29 U.S.C. § 255(a); *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988).  As indicated in Section III(B)(1) above, at least two Plaintiffs' claims are time-barred even if the three-year statute of limitations is applied.  At least ten other Plaintiffs' claims may only survive upon a showing of **willfulness** because those Plaintiffs failed to file consent forms within two years after their respective claims accrued. (*See* fn 4 for listing of ten Plaintiffs)  Thus, individualized inquiries on the willfulness issue are necessary to determine whether, in each case, FleetCor knew of or showed reckless disregard for the particular overtime violation alleged by that Plaintiff. *See Beckworth v. Senior Home Care, Inc.,* No. 12-351 (Doc. 283) (N.D. Fla. Sept. 5, 2014) (decertifying collective action because, *inter alia,* statute of limitations appeared to bar certain plaintiffs' claims and not others); *Hardemon v. H&R Block Eastern Enters.*, 2011 WL 3704746, *3 (S.D. Fla.  Aug. 23, 2011) (fact that some plaintiffs' claims are time-barred weighs against collective treatment); *Illano,* 2010 WL 9553051, *4 (granting motion for decertification, in part, because individualized inquiries would need to be made as to whether plaintiffs' claims were time-barred).

**3.    Some Plaintiffs are estopped from recovery due to pending bankruptcies.**

Certain Plaintiffs may also be barred from recovery because they failed to include their FLSA claim in their pending bankruptcy cases.  *See Anderson v.*

28

*Entergy Operations, Inc.*, 2012 WL 5400059, *5 (S.D. Miss. Nov. 5, 2012) (holding plaintiff was judicially estopped from pursuing FLSA claim, where he failed to include claim as asset in bankruptcy proceedings).   FleetCor's investigation thus far suggests that at least eight Plaintiffs had pending bankruptcy proceedings when they opted into this action or subsequently filed for bankruptcy after opting in, yet they failed to list their overtime claim as an asset in the bankruptcy proceedings.[11]   As such, individual discovery and analysis will be required to determine whether those Plaintiffs' claims are barred. *See Beckworth,* No. 12-351 (Doc. 283) (N.D. Fla. Sept. 5, 2014) (decertifying collective action because, *inter alia,* at least one plaintiff was subject to estoppel defense for failing to disclose overtime claim in bankruptcy petition).

### 4.    <u>Serious credibility issues plague some of the Plaintiffs.</u>

Some of the Plaintiffs lack credibility, which undermines their overtime claims.   As with all other witnesses, FleetCor should be allowed to introduce evidence concerning each Plaintiff's credibility.   For example, Green swore in her interrogatory responses that she worked an average of four overtime hours per week throughout her employment. (Green 82, Green Exh. 4)   During her

---

[11] These individuals are Harold Odister, Harold Parker, Susan Pressley, Pascha Rankins, Yvonne Sanford, Gwenda Travis, Christopher Yeates and Gail Young. (*See* Exh. 8)

PD.14448910.1

deposition, she increased that number to six overtime hours per week, while also acknowledging that she took a three-month leave of absence, after which she worked **part-time**. (Green 28-29, 69)  Green also had strict drop-off and pick-up responsibility for her young child at daycare. (Green 21)  All of these facts cast doubt on the credibility of her claim that she worked six hours of overtime every week of her employment.  Similarly, Miller claimed in his interrogatories that he worked unpaid overtime after August 2013, but then he admitted in his deposition that he did not. (Miller 76-77, 81-82, 107, Miller Exh. 8)

Moreover, some of the Plaintiffs were involuntarily terminated and/or resigned for reasons or under circumstances reflecting directly on their credibility. (Citarella Decl. ¶ 23)  For example, FleetCor terminated Green because she accepted substantial payroll overpayments without ever notifying FleetCor that she was receiving more than twice her salary. (Green 32-35; Green Exh. 1)  Another Plaintiff reported to work at other companies while purportedly being "absent" from FleetCor. (Citarella Decl. ¶ 23)  One individual made misrepresentations to customers about FleetCor's products and services, while another individual attempted to circumvent FleetCor's sales policies to obtain more commissions. (Citarella Decl. ¶ 23)  Another Plaintiff was terminated for fraud. (Citarella Decl. ¶ 23)  FleetCor will need to offer individualized evidence of the circumstances

surrounding the separation of these Plaintiffs' employment in order to challenge their credibility. *See Hardemon*, 2011 WL 3704746, at *3 (denying certification and recognizing as a justification that "Defendant may elect to argue that …. Riveron is retaliating [by filing an FLSA claim] for being terminated for filing fraudulent tax returns").

### 5.   Additional defenses are available against certain Plaintiffs.

Evidence obtained during discovery suggests that other individualized defenses are available with respect to certain Plaintiffs' claims. First, evidence suggests many Plaintiffs were likely paid for 40 hours in weeks in which they worked far less than 40 hours. Thus, these Plaintiffs' claims for alleged unpaid overtime wages may be **offset** by the pre-payment of full wages in weeks where they worked fewer than 40 hours. *See, e.g., Martin v. Pepsi America*, 628 F.3d 738, 742 (5th Cir 2010) (limiting *Singer v. City of Waco, Texas*, 324 F.3d 813 (5th Cir. 2003) to "wages that the employer pre-paid to the plaintiff-employee"); *Singer*, 324 F.3d 813 (affirming district court's offset of alleged unpaid overtime by overpayments in other weeks); *Roman v. Maietta Constr.*, 147 F.3d 71, 76-77 (1st Cir. 1998) (allowing employer to offset comp time received by plaintiffs against unpaid overtime to prevent windfall); *Avery v. City of Talladega, Alabama*, 24 F.3d 1337, 1344-45 (11th Cir. 1994) (allowing city to offset amounts paid to

31

officers for non-compensable 30-minute meal breaks against alleged unpaid overtime); *Goulas v. LaGreca,* 2013 WL 2477030 (E.D. La. 2013) (allowing employer to offset against alleged unpaid overtime payments to employee in weeks in which he worked fewer hours than what salary was intended to cover). In this case, the pre-payments would have occurred, for example, in weeks in which Plaintiffs were awarded "Early-Outs," but were paid as though they worked a full 40 hours. *See Goulas,* 2013 WL 2477030.

Another example of a necessary offset is that Green admitted in her deposition that she was overpaid approximately $7,000.00 by FleetCor and that she has never repaid FleetCor. (Green 41; Green Exh. 1) *See Grayson v. Opus Trading Fund, LLC,* No. 10-81105 (S.D. Fla. June 27, 2011) (allowing assertion of set-off defense based on post-termination, lump-sum payment, describing it as viable defense under FLSA).

Further, some but not all Plaintiffs claim alleged overtime in connection with sales calls made at home or in their car, which may have lasted only a couple of minutes. (*See* Green 47, 68-69; Exh. 7, pp. 298-99) Thus, some but not all Plaintiffs' claims for alleged unpaid overtime may be subject to the *de minimis* doctrine defense. *See* 29 C.F.R. § 785.47 ("uncertain and indefinite periods of time involved of a few . . . minutes duration" may be disregarded); *Lindow v.*

*United States*, 738 F.2d 1057, 1062 (9th Cir. 1984) ("Most courts have found daily periods of approximately 10 minutes *de minimis* even though otherwise compensable").   An analysis of whether any additional time worked by each Plaintiff is *de minimis* turns on individualized testimony from each Plaintiff as to the duration of the additional time worked.   FleetCor has a right to examine the activity each Plaintiff claims is compensable to determine whether the *de minimis* defense applies.   *See, e.g., Espinoza v. County of Fresno*, 290 F.R.D. 494, 506 ("Courts have found that the *de minimis* issue can support a finding of decertification"); *Reed*, 266 F.R.D. at 453 (noting that *de minimis* defense is individualized "by its nature").

## D.   Fairness and Procedural Considerations Require Decertification.

The third decertification factor to be considered is whether it would be fair and procedurally feasible to proceed on a collective basis.   *Morgan,* 551 F.3d at 1264; *Anderson*, 488 F.3d at 953.   FLSA collective actions are intended to: (1) reduce the burden on plaintiffs through the pooling of resources; and (2) efficiently resolve common issues of law and fact that arise from the same illegal conduct. *Hoffman-LaRoche, Inc. v. Sperling,* 493 U.S. 165, 170 (1989); *Morgan,* 551 F.3d at 1264.   The efficiency gained by permitting plaintiffs to proceed collectively

33

"cannot be obtained at the expense of [the defendant's] due process rights." *Knott*, 897 F. Supp. 2d at 1241.

Courts have also recognized that decertification is appropriate where litigating a collective action would be unwieldy for the court and/or jury. *See, e.g., Reyes v. Texas EZPawn, L.P.*, 2007 WL 101808, *6 (S.D. Tex. Jan. 8, 2007). Thus, courts must consider whether a fair ruling can be reached on the basis of representative evidence and whether such evidence exists. *See Zivali v. AT & T Mobility, LLC*, 784 F. Supp. 2d 456, 459 (S.D.N.Y. 2011) (decertifying collective action where the court "harbor[ed] considerable doubt that any fair determination could be achieved on the basis of representative evidence").

For evidence to be "representative" enough to stand in for individual testimony, the representatives need to "have done roughly the same amount of work, including the same amount of overtime work, and had been paid the same wage" as the rest of the collective class. *Espenscheid*, 705 F.3d at 774. If not, a damage award could overcompensate some, including some who have no damages, and under-compensate others. *See id.* (describing the problem of giving one individual a "windfall" while another gets under-compensated by half, based on use of a sample).

## 1.     <u>Representative evidence cannot fairly establish liability.</u>

34

The record evidence demonstrates that, during the applicable period, the 79 Plaintiffs had different job duties (Inbound versus Outbound), work habits and pay structures. They also worked under numerous different managers who had varying policies and practices, worked on different teams, and were paid according to different compensation schemes during different periods of time. Thus, one Plaintiff, or a small group of Plaintiffs, cannot fairly provide representative evidence that is binding on all members of the collective class.

Both Miller and Green admitted in their depositions that they cannot provide such representative testimony. (Green 98; Miller 113) Miller testified that there is "[n]ot one" member of the collective class whom he can speak to in terms of their work experiences and number of hours worked. (Miller 113; Miller Exh. 11) Miller also admitted his experience as an Outbound Sales Representative may not be representative of other representatives' experience and that some representatives may not have worked over 40 hours in a week. (Miller 112-13) Green similarly testified that she had no knowledge of the work habits or hours worked by other members of the collective class, nor could she estimate the number of hours other Plaintiffs generally worked. (Green 90-92, 95-98; Green Exh. 5) Although Green said she occasionally saw some Plaintiffs working through lunch or after 5:00, she

admitted she did not know whether those Plaintiffs were working late to make up time. (Green 90-92, 95-98; Green Exh. 5)

In light of all of the facts herein, it would be "unfair and impractical, to both sides, to have representative testimony presented for the proposed class when any one plaintiff's situation is potentially markedly different from another's." *Creely v. HCR ManorCare, Inc.*, 920 F. Supp. 2d 846, 857 (N.D. Ohio 2013).

### 2.    Representative evidence cannot fairly establish damages.

There is no "mechanical, formulaic" method for calculating damages for all Plaintiffs because the amount of time worked by each Plaintiff requires highly individualized analyses. *Espenscheid,* 705 F.3d 770 (decertifying FLSA collective action where a "mechanical, formulaic" calculation of damages was not possible); *cf. Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (reversing Third Circuit decision certifying Rule 23 class action, where "[q]uestions of individual damage calculations [would] inevitably overwhelm questions common to the class").

In order to determine Plaintiffs' damages (*i.e.,* hours worked which were suffered or permitted), one would have to question managers regarding their specific knowledge of hours worked by a particular Plaintiff (and regarding factors that impacted the hours worked, such as their territory assignment, their team's

practices, such as self-prospecting, Early-Outs, etc., and the specific tasks performed by that Plaintiff). In addition, one would have to review documentary evidence, including calendars and other records of managers reflecting hours worked by a particular Plaintiff, telephone record data, and Plaintiff's personal calendars and other records reflecting their estimates of hours worked. Thus, calculating Plaintiffs' damages would require intensive analyses of each Plaintiff's daily activities, rather than an extrapolation based on the experiences of others.

The Court would also need to individually determine each Plaintiffs' "regular rate," to determine his or her overtime premium rate. 29 C.F.R. § 778.109. The regular rate would differ for each Plaintiff for each week based on the varying commission structures, quotas, and hours allegedly worked. *See id.* (regular rate is determined by dividing employee's "total remuneration . . . in any workweek by the total number of hours actually worked by him in that workweek"). The overtime rates will differ for each Plaintiff, and each single Plaintiff will have different overtime rates for each workweek in question.

The use of representative evidence concerning alleged damages would inevitably result in a windfall for those Plaintiffs who did not work more than 40 hours per week. Indeed, as recognized by this Court in *Rindfleisch,* the fairness factor necessitated decertification because:

> it would be a miscarriage of justice for Gentiva to pay overtime
> damages to a subset of Plaintiffs who are not actually owed any
> overtime damages. Likewise, it would be improper for Plaintiffs who
> did not work overtime to receive such damages.

*Rindfleisch,* 2014 WL 2002834, *6. Adjudication of Plaintiffs' claims requires

individualized analyses that would effectively result in a number of distinct mini-

trials, "contravene[ing] the 'basic theory of judicial economy upon which the

certification of collective actions is based.'" *Whineglass v. Smith*, 2013 WL

2237841 (M.D. Fla. May 21, 2013), *10 (citation omitted); *see also King v.

CVS/Caremark Corp.,* 2008 WL 5973490, *5 (S.D. Fla. Sept. 11, 2008)

(decertifying collective action because, *inter alia,* "collective action would evolve

into mini-trials concerning the claims of each Plaintiff – contrary to fairness and

case manageability"); *see also Briggins v. Elwood TRI, Inc.*, 882 F. Supp. 2d 1256,

1279 (N.D. Ala. 2012) (decertifying collective action that "would either proceed

under a faulty and prejudicial method for finding liability and calculating damages

while the defendants are hogtied in presenting their defenses, or would result in

individual trials, rendering the collective action unmanageable"); *Hernandez v.

United Auto Credit Corp.*, 2010 WL 1337702, *5 (N.D. Cal. Apr. 2, 2010)

(decertifying collective action where "[t]he potential for a class-wide ruling on

liability seem[ed] slim. And even if liability could be determined on a class-wide

basis, the court would still face the prospect of having to determine individualized damages").

## IV.   <u>CONCLUSION</u>

For all these reasons, collective action treatment is inappropriate in this case.

Accordingly, the conditionally-certified collective class should be decertified.

Respectfully submitted this 15th day of December, 2014.

**PHELPS DUNBAR LLP**
II City Plaza
400 Convention Street
Suite 1100
Post Office Box 4412
Baton Rouge, Louisiana  70802
Telephone: (225) 346-0285
Facsimile: (225) 381-9197

/s/ Susan W. Furr
Susan W. Furr
Louisiana Bar No. 19582
*susie.furr@phelps.com*
Jessica C. Huffman
Louisiana Bar No. 30445
*huffmanj@phelps.com*
(admitted *pro hac vice*)

**PHELPS DUNBAR LLP**
100 South Ashley Drive
Suite 1900
Tampa, Florida  33602
Telephone: (813) 472-7550
Facsimile: (813) 472-7570

Dennis M. McClelland
Florida Bar no. 0091758
*dennis.mcclelland@phelps.com*
(admitted *pro hac vice*)

Counsel for Defendant

**POLSINELLI PC**
1355 Peachtree Street, N.E.
Suite 500
Atlanta, Georgia 30309-3232
Telephone: (404) 253-6000
Facsimile: (404) 253-6060

James J. Swartz, Jr.
Georgia Bar No. 694319
*JSwartz@Polsinelli.com*
Teeka K. Harrison
Georgia Bar No. 543115
*THarrison@Polsinelli.com*

Local Counsel for Defendant

39

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| KEITH MILLER, individually and on behalf of all other similarly situated individuals | ) ) ) ) | |
| Plaintiff, | ) ) | CIVIL ACTION NO.: **1:13-CV-2403-SCJ** |
| v. | ) ) | |
| FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC, | ) ) | |
| Defendant. | | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 15, 2014, I electronically filed the foregoing Defendant's Memorandum in Support of Motion for Decertification with the Clerk of Court using the CM/ECF system, which will send electronic notice to the following counsel of record:

John Thomas Sparks, Sr.
Austin & Sparks, P.C.
2974 Lookout Place, N.E., Suite 200
Atlanta, GA 30305-3272
404-869-0100
Fax: 404-869-0200

Rachhana T. Srey
Tim Selander
Nichols Kaster, PLLP-MN
80 South 8th Street
4600 IDS Center
Minneapolis, MN 55402
612-256-3200
Fax: (612) 215-6870

*s*/Susan W. Furr
Counsel for Defendant

40