## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **KEITH MILLER, individually and on behalf of all other similarly situated individuals,** | § § § § § | |
| **Plaintiff,** | § § | |
| **v.** | § § § | **CIVIL ACTION NO. 1:13-cv-2403-SCJ** |
| **FLEETCOR TECHNOLOGIES OPERATING COMPANY, LLC,** | § § § | |
| **Defendant.** | § § | |

## PLAINTIFFS' OPPOSITION TO
## DEFENDANT'S MOTION FOR DECERTIFICATION

### INTRODUCTION

This is a locally confined collective action lawsuit brought under the Fair Labor Standards Act ("FLSA") to recover unpaid overtime wages for 77 current and former inside sales representatives ("ISRs") employed by Defendant in Norcross, Georgia. In the limited discovery conducted by the parties, an objective review of the facts reveals that Defendant's management, from Paul Citarella, who leads Defendant's inside sales organization, down to the team leads and managers who directly supervise ISRs, inculcated a high pressure sales environment that knowingly

1

and willfully flouted the FLSA's recordkeeping and overtime pay requirements by repeatedly and consistently encouraging ISRs, including Plaintiffs, to work as many hours as possible to meet sales goals while simultaneously refusing to pay them overtime wages when they worked those hours.

The testimony, which consists of interrogatory responses from 76 Plaintiffs and depositions of two Plaintiffs and Defendant's corporate designee, establishes that all Plaintiffs worked overtime hours for which they were not paid, had one primary job duty, used the same computer programs that may support their overtime claims, were uniformly and simultaneously classified as exempt and reclassified as non-exempt, were subject to the same time recording policies and practices, and were frequently encouraged to work overtime hours and told they would not be paid overtime wages by managers who reported to a single executive who was highly involved in the day-to-day operations of Defendant's inside sales team and who himself repeatedly encouraged ISRs to work overtime.  Given these facts, this case can and should be tried collectively, and Defendant's motion should be denied.

## PROCEDURAL HISTORY

Plaintiff Keith Miller filed his FLSA collective action Complaint on July 18, 2013, bringing overtime claims on his own behalf, and seeking to represent a collective class consisting of, "all persons who perform(ed) work for Defendant as

inside sales representatives, and in other similar positions, at any time within three years of the filing of this Complaint."   (See ECF No. 1, Compl. ¶ 26.)   Defendant answered the Complaint on August 28, 2013, denying Plaintiff's allegations and contending, among other things, that "Plaintiff and other individuals allegedly similarly situated to him were exempt from the overtime requirements of the FLSA during all or part of the applicable time period."   (ECF No. 26, Def.'s Ans. p. 13.)

On December 20, 2013, the parties filed a Stipulation with the Court seeking to conditionally certify this case as a collective action, and specifically reserving their right to brief arguments relating to the proper scope and form of court-authorized notice.   (ECF No. 49.)   On January 23, 2014, Plaintiffs filed their Motion for Approval of Proper Scope, Manner, and Form of Court-Authorized Notice, which the Court granted on April 8, 2014.   (ECF Nos. 59, 85.)   On May 2, 2014, Plaintiffs' counsel mailed the Court-approved notice of this lawsuit to the 178 putative members of the collective class consisting of "[a]ny individual who worked for [Defendant] in Norcross, Georgia, in the position of "Inside Sales Representative" or "Outbound Sales Representative" at any time from December 15, 2010 to August 1, 2013."

(Selander Aff. ¶ 3.)  Following the close of the notice period, a total of 80 Plaintiffs opted-in to the case. (Id. ¶ 4.)  There are currently 77 Plaintiffs in the collective. (Id.)[1]

Before this matter was conditionally certified as a collective action, the Court granted the parties' request to set the discovery deadline as May 27, 2014.  (ECF No. 45.)  During the notice period, the parties filed a joint request to extend that and other case deadlines because at that time, the opt-in deadline had not yet passed and the ultimate size of the collective was uncertain.  (ECF No. 97.)  The parties requested permission to file a modified case management plan fourteen days after the expiration of the opt-in period.  (Id.)  The Court granted the parties' request.  (ECF No. 99.)

On July 15, 2014, the parties submitted their Joint Status Report and Request for Entry of an Amended Scheduling Order.  (ECF No. 114.)  Therein, the parties noted that the opt-in period had closed, that the case then consisted of 79 Plaintiffs, and that although both parties had served written discovery and exchanged documents, additional time was needed for discovery.  (Id.)  The parties also explained that they disagreed about how much additional time was needed: Plaintiffs requested four additional months; Defendant requested nine.  (Id.)   In its July 17,

---

[1] One Plaintiff, Tonya Pickett, withdrew from the action on September 29, 2014. (ECF No. 140.)  The parties agree that another Plaintiff, Sandra Siddell is ineligible and should be dismissed.  (Selander Aff. ¶ 4; Def.'s Mem. p. 10.)  The parties also agree that a third Plaintiff, Tara Gray does not have a claim within the three year statutory period and should also be dismissed.  (Id.)

2014 Order, the Court set October 17, 2014 as the discovery deadline and November 17, 2014 as the decertification deadline.   (ECF No. 116.)  According to the Court, if a decertification motion was filed, the parties would need to submit a status report with proposed revised scheduling deadlines, including deadlines for any necessary additional discovery, after its ruling on decertification.  (Id.)

During the intervening months, the parties continued their discovery efforts. Defendant continued to serve each opt-in Plaintiff with individualized interrogatories and document requests.   (Selander Aff. ¶ 5.)   Of the 77 Plaintiffs in the collective, 76 responded.  (Id. ¶ 6; Ex. 1.)   Both parties also produced documents and took depositions.  (Selander Aff. ¶ 5.)   Plaintiffs deposed Defendant's Fed. R. Civ. P. 30(b)(6) corporate designees on August 26, 2014, and Defendant deposed Named Plaintiff Keith Miller and Opt-in Plaintiff Tisha Green on August 27, 2014.[2]  (Id.)

On September 17, 2014, the parties filed a Joint Motion to Stay and Modify the Scheduling Order to allow the parties to prepare for and participate in a mediation session with a goal of settling the case without further litigation.  (ECF No. 134.) The parties also requested that the Court modify the scheduling order by extending the discovery deadline from October 17, 2014 to January 30, 2015 and the decertification filing deadline from November 17, 2014 to February 27, 2014.  (Id.)

---

[2] Both parties also served notices for additional depositions, but these depositions were put on hold for mediation.  (Selander Aff. ¶ 5.)

That same day, the Court issued a Minute Order granting in part and denying in part the parties' requests.  (See Sept. 17, 2014 Minute Order.)    Specifically, the Court stayed the case for 60 days, through and including November 14, 2014, denied the parties' request to extend the discovery deadline, and set December 15, 2014, as the deadline to move for decertification.  (Id.)

Consistent with their request to stay the case for mediation purposes, the parties scheduled a mediation session with mediator Daniel Klein to take place in Atlanta, Georgia on October 30, 2014.  (Selander Aff. ¶ 7.)   In preparation for mediation, the parties continued to exchange information and analyze electronic data concerning each of the Plaintiff's claims.  (Id.)  Plaintiffs made a pre-mediation settlement demand on October 28, 2014.  (Id.)  On October 29th, Plaintiffs' counsel traveled to Atlanta for the October 30th mediation.   (Id.)   Later that evening, Defendant's counsel informed Plaintiffs' counsel that Defendant unexpectedly and without explanation canceled the mediation session.  (Id.)

Given that Defendant cancelled the mediation, Plaintiffs understood the case was no longer stayed and served Defendant with deposition notices for ten managers to take place on November 6, 7, 12, and 13.  (Selander Aff. ¶ 8.)   But, after Defendant's counsel represented that they were attempting to reschedule the mediation, Plaintiffs re-served the deposition notices to take place after November

14, 2014, the date the Court-imposed 60-day stay ended. (Id. ¶ 9.) Defendant responded to the deposition notices by contending that Plaintiffs could not conduct any additional depositions unless the parties requested permission from the Court to do so and informed Plaintiffs they would not be producing the witnesses as noticed. (Ex. 2.) Plaintiffs noted the parties' disagreement over whether discovery could proceed and informed Defendant that they did not believe that a joint motion requesting that discovery be re-opened was necessary. (Id.) Defendant filed the instant motion on December 15, 2014. (ECF No. 146.)[3]

## FACTS

Defendant FleetCor Technologies Operating Company, LLC ("Defendant" or "FleetCor") is a business that provides credit card services to businesses with fleets of vehicles. (Citarella Dep. 13:5-14:17.)[4] Using Defendant's "fleet cards" allow its customers to track, control, and limit fuel expenditures by workers who purchase fuel as part of their job duties. (Id.) Defendant is headquartered in Norcross, Georgia. (Id. at 16:3-5.) Defendant employs ISRs, all of whom work in Norcross, to sell fleet

---

[3] In the end, Defendant never approached Plaintiffs with a proposal for rescheduling the mediation, and never responded to Plaintiffs' settlement demand. (Selander Aff. ¶ 7, 9.) Plaintiffs can only speculate as to whether Defendant ever truly intended to negotiate in good faith or whether mediation was some sort of ploy.

[4] The transcript of the August 26, 2014 deposition of Paul Citarella taken pursuant to Rule 30(b)(6) ("Citarella Dep.") is attached hereto as Exhibit 3.

cards and a few other peripheral products.  (<u>Id.</u> at 39:9-18, 45:11-47:5.)  It currently employs approximately 180 ISRs.  (<u>Id.</u> at 21:17-19.)

Plaintiffs are current and former ISRs.  (<u>See</u> Ex. 1.)  Although Defendant splits ISRs into two job titles—inbound and outbound sales representatives—their job duties and compensation structure are nearly identical.[5]  (Ex. 4; Citarella Dep. 45:11-47:5, 68:5-8, 93:1-95:4.)  Specifically, the primary job duty of all ISRs is to sell Defendant's fuel card services to businesses.  (Citarella Dep. 45:11-47:5, 68:5-8.) They do so from inside Defendant's office by phone and email; Defendant does not allow ISRs to make outside sales.  (<u>Id.</u> 63:22-64:3.)  ISRs all use three primary computer programs to do their inside sales work: Microsoft Outlook (to communicate by email), GADD (a computer program that allows users to make calls from their computer and that tracks and records certain aspects of the calls (who was called and by whom, when the call was made, and how long it lasted)), and SalesForce.com (a web based customer management tool).  (<u>Id.</u> 81:19-82:16, 84:19-23, 85:12-87:6, 87:16-89:13, 90:3-10.)

Defendant requires all ISRs to make a certain number of calls per day and expects them to spend at least 1.5 to 2 hours on the phone each day.  (<u>Id.</u> 98:18-99:14, 100:9-16.)  ISRs earn commission based on the number of gallons of fuel sold – in

---

[5] Defendant has not identified which Plaintiffs worked in which position, and during what time periods.

other words the number of gallons of fuel their customers "pumped." (Id. 114:15-25, 117:10-16.)  The commission structure for all ISRs is the same, although the amounts required to hit certain levels may vary. (Id. 116:1-117:16.)  Defendant ranks all ISRs within the inside sales organization on their sales and publishes their progress towards sales goals in "Stack Standings" which are issued every week. (Id. 114:1-11.)

ISRs are the lowest level employees in Defendant's inside sales group. (Id. 33:25-34:8, 35:10-37:8.)  ISRs report to team leads, who report to a director or senior manager. (Id. 35:21-36:5.)  Directors and senior managers report to Paul Citarella, Defendant's Senior Vice President of Sales who has led Defendant's inside sales group since he was hired in 2008. (Id. 11:15-22, 26:25-27:7, 33:25-34:8, 35:10-37:8.)  Defendant organizes the inside sales group's workspace so that ISRs, team leads, directors, and senior managers all work near each other in cubicles. (Id. 42:11-45:10.)  Mr. Citarella works in an office on the same floor as many of the ISRs. (Id.)  Defendant requires all employees to swipe a badge when they enter the building or the floor on which they work and maintains some records of the date and time that each employee's badge is swiped. (Id. 78:17-80:6; Keirbeck Dep. 10:6-18:11.)[6]

---

[6] Cited excerpts of the August 26, 2014 deposition of Waddaah Keirbeck taken pursuant to Rule 30(b)(6) ("Keirbeck Dep.") are attached hereto as Exhibit 5.

Defendant pays all ISRs under the same structure: salary (and later hourly, as explained below) plus commission.  (Ex. 4 (ISR Job Descriptions); Citarella Dep. 120:19-121:16, 122:15-124:6.)  Prior to June 3, 2011, Defendant uniformly classified all ISRs as exempt and did not record their hours worked.  (Citarella Dep. 122:15-124:6.)[7]  On that date, Defendant uniformly reclassified all ISRs as non-exempt.  (Id.)  Until this lawsuit was filed in July 2013, Defendant's managers purportedly tracked ISRs' hours worked by their "visual" observations of each individual's arrival, lunch break, and departure time.  (Id. 143:18-144:6, 183:24-185:3.)  After this lawsuit was filed, Defendant started a policy allowing inside sales representatives to record their own hours worked, and to report them simultaneously to Human Resources and their managers.  (Id.  143:18-144:6, 181:17-25.)   In practice, however, Plaintiffs— regardless of what job title they held, when they worked for Defendant, or who they directly reported to—regularly worked more than forty hours per week with their managers' knowledge and were encouraged and directed by management to work overtime hours for which they were not paid.  (See Miller Dep. 80:14-81:11, 85:13-

---

[7]  Defendant did not conduct an individualized analysis of any of its sales representatives to determine whether they should be classified as exempt, instead applying the same exemption that it applied to its outside sales representatives. (Citarella Dep. 117:17-118:24).

86:15, 87:11-15, 89:25-91:14;[8] Green Dep. 49:14-52:19, 80:1-20, 88:9-25;[9] Ex. 1,

Plaintiffs' Interrogatories.[10])  Plaintiffs' claims are bolstered by the near total absence

---

[8] Cited excerpts of the August 27, 2014 deposition of Plaintiff Keith Miller ("Miller Dep.") are attached hereto as Exhibit 6.

[9] Cited excerpts of the August 27, 2014 deposition of Plaintiff Tisha Green ("Green Dep.") are attached hereto as Exhibit 7.

[10] Plaintiffs provided specific testimony in their interrogatory answers regarding (1) management instructions to work overtime hours, (2) management statements that ISRs were not entitled to overtime pay, (3) management's dismissal of their complaints that Defendant failed to pay overtime, and/or (4) management threatening ISRs with termination or disciplinary action for failing to meet goals. (See Ex. 1, **Jessica Adams** (stating that managers "constantly remind[ed] [ISRs] that they must complete their required sales calls no matter what."); **Kenyatta Alexander** (stating that management "expected [her to] finish her demonstrations, calls, and applications required for the day even if it meant staying late."); **Sivan Ariel** (recalling a meeting in 2013 when John Thomas told ISRs "This is not a 9-5 job. You can't be successful without working longer hours. Just put in extra time to make those extra calls."); **Torrey Bates** (stating that managers Nick Popov and John Thomas often commended him "for coming in early and working extra hours" and recalling that he complained to Nick Popov in October 2012 about working so many hours without compensation, that Mr. Popov asked Plaintiff to "hold out" and he would eventually be compensated, but that nothing ever changed after this complaint."); **Janava Benton** (stating that John Thomas and Carlos [Luckerson] "directed her to work late and finish certain accounts . . . in winter 2012," and that she complained to Mr. Luckerson about overtime pay, and that he told her that human resources rejected his request that she be paid); **Charles Betts** (stating that Paul Citarella told the sales team at monthly meetings, "This is a sales job, you have to make your goals. Don't be afraid to stay late," and recalling a complaint he made to Tony Chase about working late without compensation and that Mr. Chase told him "you don't have to work it if you don't want to but we frown on it and the good results will go to the people who do the work"); **Steven Blair** (stating that Lolu Adewakun told ISRs on numerous occasions to "make their goals by any means necessary."); **Dahlia Blake** (stating that John Thomas told ISRs at sales meetings "you have to do what you have to do to get ahead," and recalling that she occasionally spoke to Bill Jackson about not being compensated for overtime and that he would tell her, "your numbers and commission

will compensate you eventually."); **Cozette Bond** (stating that Michael Williams and John Thomas "frequently" told ISRs during meetings "you have to do what it takes to make your quota."); **William Burnette** (stating that during sales meetings, John Thomas told ISRs "This is not a 9-5 job. You have to go above and beyond to be successful. I'm not saying to not take a lunch but sometimes you have to work through it to make those gallons," and recalling that he mentioned not receiving overtime pay a few times to his supervisor Kimberly Coleman and she said "FleetCor does not pay overtime."); **Shawn Collins** (stating that her supervisors "frequently" told her and other ISRs to "stay until the work was done," encouraged ISRs to stay late to call customers on the West Coast, and that she complained to Tony Chase and Mike Williams in late 2011 stating her belief that if she was paid hourly, she should be paid for every hour worked and their response that she simply had to "hit her numbers to keep her job and that more work meant she would make more in commission."); **Howard Conoly** (stating that John Thomas told ISRs at the end of each month "this is not a 9-5 job, you have to work to be successful."); **Raytheon Copney** (stating that on a daily basis Dwayne McCarmick and John Thomas told ISRs that they needed to hit their numbers and encouraged them to work through lunch if necessary.  Also stating that she spoke to Mr. McCarmick about working so many hours but still struggled to sell a difficult product and that he told her "I understand that it's hard but these guys wanna see numbers."); **Rodney Deas** (stating that John Thomas told ISRs at sales meetings "This is a quota job, not a 9-5 job. You have to get it done. Do what it takes, no excuses."); **Luther Divers** (stating that Lolu Adewakun frequently told ISRs that "if you don't meet your quota, you will be let go."); **Tifini Epps** (stating that her managers "constantly" reminded ISRs "to finish their calls no matter what."); **Victor Fernandez** (stating that John Thomas frequently told ISRs "this [is] not a 9-5 job" and they "had to work to be successful."); **Steve Garner** (stating that Carlos Luckerson told him "This is not a 9-5 job. You have to work hard to be successful."); **Christina Graham** (stating that Bill Jackson and John Thomas told her that if ISRs did not make their goals they would be terminated); **Stacey Green** (stating that Nick Popov told him on a weekly basis "I need people on the phone, I need people to call after hours to get those quotas. Do what it takes to get it done," and recalling that he spoke to Mr. Popov about how he was not paid to work extra hours and Mr. Popov told him "Well you have to hit your quota, the team needs it. Do what you have to do for the team."); **Tarik Green** (recalling that "on multiple occasions" Bob Medland asked him to stay late to call West Coast accounts."); **Tisha Green** (stating that Bill Jackson told ISRs "stay until your calls are finished" near the end of every month if sales goal numbers had not been reached, and recalling that she

made an oral complaint to him about working overtime hours without compensation and that his response that she was not entitled to overtime "because she was a salaried employee."); **Sidney Haynes** (stating that John Thomas spoke with him when his numbers were down and told him that he had to increase them or "else we might make some changes," and recalling that Mr. Thomas told him at a few sales meetings when he first started that overtime "is not done at FleetCor."); **Gail Hill** (stating that Bill Jackson told her "you need to complete your calls, stay over if you have to."); **Dawn Jackson** (stating that at the end of every month, Dwayne McCormick would tell ISRs "we're not at our goals yet, you have to do what it takes to hit your goals."); **Kenrick Jagmohan** (stating that John Thomas encouraged ISRs to stay late, and that in June 2012 he told ISRs "the way the top dogs win is that they're still there after you leave. That's how they're the top dogs."); **Roody Jasmin** (stating that John Thomas and Bill Jackson "consistently" told ISRs "this is not a 40 hour a week job. You can't make it just working 8-5," and recalling that he would talk to Ken Williams about overtime at the end of the month when ISRs were pressured to work extra hours, and Mr. Williams stating "We both know FleetCor doesn't pay overtime. You have to work so you hit your goals, help the team, and are paid."); **Kimberly Jefferson** (stating that there was "a clear message that [ISRs] who failed to make their quota would be fired."); **Barbara Jones** (stating that Bill Jackson "frequently encouraged [ISRs] to work late and through lunch"); **Douglas Jones** (stating that supervisors "frequently" told ISRs at morning meetings that if "you need to stay late to make your numbers, then you have to do it," and that he occasionally complained to supervisors that he needed to leave work but had not met his sales quota and that they told him "you have to do your job; you need to hit your numbers."); **Essig Kemp** (stating that Ken Matthews "constantly" reminded ISRs that they were in danger of losing their jobs if they did not meet their metrics); **Carlin King** (stating that at weekly sales meetings, John Thomas and Kimberly Coleman would encourage ISRs to "do whatever it takes to get the job done, this is not a 9-5 job, you have to work to be successful."); **Kelly King** (stating that Bill Jackson encouraged him to stay late and make sales calls to California accounts on multiple occasions); **Alan Kipping** (stating that managers "frequently" reminded ISRs that they had to make their numbers in order to avoid disciplinary action.); **Roger Lett** (stating that Richard Hayes frequently told him "if you have to stay over to get what you need to get done, then you stay over," and that he occasionally asked Michael Williams and John Thomas if he could be paid for the overtime hours that he worked, and they told him "No, you have to do what you have to do to make your goals and keep your job."); **Anthony Liggins** (stating that Lester Rivera "frequently" told him that he had to

make his numbers and to come in early or stay late in order to meet his goals); **Amber Makupson** (stating that Lolu Adowakin "consistently" told ISRs that if they did not make their call goals their jobs would be threatened); **Kirk Martells** (stating that at sales meetings John Thomas told ISRs to "Do what they had to do to hit their numbers."); **Damon Mason** (stating that during monthly sales meetings managers told ISRs "this is not a 9 to 5 job," that if they did not hit their sales goals they would be terminated, and reminded ISRs that "top producers stay late"); **Keith Miller** (stating that John Thomas "repeatedly" told ISRs during monthly floor meetings that "it was not a 9-5 job," that Mr. Thomas told ISRs that he did not want them to leave at 5 PM, and that instead, he wanted ISRs "to continue to work until they finished their calls." Also stating that he complained to Nick Popov about the number of hours he was working without pay and that Mr. Popov told him that "this is a job where you have to work to make it."); **Harold Odister** (stating that Bill Jackson "frequently" told ISRs "Do what it takes to get it done. These customers work late and you have to work late to get them on the phone."); **Victor Onyesoh** (stating that John Thomas reminded ISRs on a daily basis "don't leave until your calls are done."); **Harold Parker** (stating that Lolu Adowakin told ISRs "nearly every day" that if they didn't do their job and make calls and sell gallons, they would be fired.); **Michael Parker** (stating that John Thomas "frequently" told ISRs at sales meetings "the best sales guys stay until 6 or 7 PM."); **Kerry Patton** (stating that he heard other ISRs complain about not being compensated for all hours worked and that they were told "FleetCor doesn't pay overtime"); **Susan Pressley** (stating that at sales meetings John Thomas told ISRs "you need to do what you need to do to make numbers. Even stay late."); **Adragust Price** (stating that his supervisors "frequently" reminded him that ISRs who failed to make their sales quotas would be fired.); **Argne Randolph** (stating that John Thomas told IRSs at sales meetings "If you don't get your calls done, expect to stay late," and that Bill Jackson told ISRs at meetings "if you work through lunch you can sell more gallons"); **Pascha Rankins** (stating that at the end of the month when fueling deadlines were approaching, Nick Popov would tell ISRs "We need to get these customers fueling. Do whatever it takes. Even if you have to call from home or in your car." And stating that she spoke to Mr. Popov in fall of 2013 and spring of 2014 regarding how he encouraged his team to accurately report their hours but that they were only paid for a flat forty hours, and that he told her on both occasions "put down what you do on the timesheet but FleetCor only pays for forty hours."); **Windell Rich** (stating that "on numerous occasions" John Thomas and Bill Jackson told ISRs "This is not a 9-5 job. The top guys who make the most money come in early and stay late."); **John Richardson** (stating that at weekly meetings,

John Thomas said "this is not a 9-5 job. You have to work to be successful," and stating that he recalled speaking with Richard Hayes in late 2012 about his offer letter, which he believed said that he would receive overtime compensation, and that Mr. Hayes told him that he did not earn overtime because he earned commission instead."); **Chett Role** (stating that John Thomas told him and other ISRs at monthly meetings, "If you can't get your job done in the time allotted in a normal workday, you still have to make your goals."); **Gerald Sanders** (stating that Bill Jackson told ISRs "5 PM has come, but keep doing those calls. We haven't reached our goals. This is a sales job; we need to make phone calls."); **Yvonne Sanford** (stating that on a daily basis Nick Popov, Lolu Adewakun, and John Thomas encouraged ISRs to stay late and make more phone calls.); **Charles Scott** (stating that managers "frequently" told ISRs "do what it takes to get the job done," and that he asked Dwayne McCormick in fall of 2012 if ISRs were compensated for working overtime hours but that Mr. McCormick told Plaintiff "no, you have to do what it takes to get the job done."); **Rachel Singha** (stating that during morning meetings John Thomas told ISRs that if they didn't meet their goals, "they shouldn't leave at 5 pm."); **Andre Smith** (stating that "it was an unspoken rule" that ISRs had to "complete their sales goals by any means necessary including staying late," and stating that he complained to Ken Matthews and Gina Tobey about hours worked without compensation but that they told him that he had to work to make commission and that "FleetCor did not pay overtime."); **Richard Stroud** (stating that at monthly sales meetings, managers encouraged ISRs to arrive thirty minutes early and stay thirty minutes late to get extra calls in.); **Anthony Thornton** (stating that at sales meetings John Thomas told ISRs "do what you need to do to hit those numbers and close out the quarter strong."); **Ray Tillman** (stating that Lolu Adewakin asked him to stay late to make calls on the West Coast and that at monthly team meetings John Thomas would say "You have to do whatever it takes to make your goals," and talked about how he was proud of ISRs who stayed late to make their calls.); **Jeannine Townsend-Coates** (stating that Richard Hayes "frequently" encouraged her to work through her breaks and lunches in order to make her sales goals.); **Gwenda Travis** (stating that Paul Citarella would "constantly remind" ISRs that "we don't close our doors and turn off our lights at 5" to encourage ISRs to stay later and make more calls); **Deordrick Veal** (stating that Lolu Adewakun told him that if he did not make his goals, he could not leave or he would be reprimanded and that he complained "almost daily" to Mr. Adewakun about how, despite his hours worked, he was only paid for 40 hours, that Mr. Adewakun said he would speak with John Thomas, "but there was never a change."); **Wilbert Walker** (stating that John Thomas and Bill Jackson encouraged him on a weekly

of recorded overtime hours and overtime pay in Defendant's payroll records: during the approximately 4,750 weeks that the 77 Plaintiffs worked between June 3, 2011 and December 27, 2013, Defendant recorded a total of seventeen overtime hours for four Plaintiffs, paying them a total of $337.38 in overtime wages.  (Selander Aff. ¶ 10.)

---

basis to stay late and make more calls, telling him that he could "miss traffic" if he stayed late.  Also stating that he complained to Bill Jackson in August 2012 about his inability to make required goals within a normal workweek and that Mr. Jackson told him that "this is a sales and commission job" and that Plaintiff should make calls through his lunch and stay late to make his goals.); **Jack Watson** (stating that he was "pressured to work late to meet his goals after receiving a verbal warning from Sharia Ward."); **Carlton Williams** (stating that Nick Popov would often see him working when Mr. Popov left the office at 5 PM and that Mr. Popov told him that he had to stay to finish his work; also stating that Mr. Popov would see him working through lunch and already at the office when Mr. Popov arrived in the morning); **Damone Williams** (stating that at team meetings, Carlos Luckerson "frequently" told ISRs, "Do what you have to do to hit the numbers. This is a sales job, leave when the job is done. No one is forcing you to leave at 5."); **Joellyn Williams** (stating that she "knew that it was expected that all sales goals should be met by the end of the day/week."); **Ken Williams** (stating that every week Kenneth Matthews and Paul Citarella instructed ISRs not to leave until their goals were completed.); **Steven Williamson** (stating that Sharia Ward sent him emails with sales statistics and told him and others they had to get their work done."); **Kevin Wilson** (stating that at every monthly sales meeting Richard Hayes and John Thomas would say "this is not a 9-5 job, you have to work to be successful," and stating that he complained to Richard Hayes in approximately spring of 2012 about hours worked without pay and Mr. Hayes told him that FleetCor "does not pay overtime."); **Christopher Yeates** (stating that he was told during his interview that he would have to work overtime hours in order to be successful.)).

All Plaintiffs similarly testified that they worked more than forty hours per week.  (Ex. 1.)  Plaintiffs also testified that their supervisors and/or managers may have knowledge that they worked more than forty hours during one or more workweeks.  (Id.)  Despite this overwhelmingly similar evidence, Defendant chose to depose only two Plaintiffs before filing the instant motion.

## ARGUMENT

## I.   THE DECERTIFICATION STANDARD

In Morgan v. Family Dollar Stores, Inc., the Eleventh Circuit described the two-stage analysis that a district court should apply "to effectively manage FLSA collective actions in the pretrial phase."  551 F. 3d 1233, 1260-62 (11th Cir. 2008).  At the first "notice" stage, "the district court determines whether similarly situated employees should be notified" of the lawsuit.  Id. at 1260.  The plaintiff bears the "burden of showing a "reasonable basis" for his claim that there are other similarly situated employees."  Id. (quoting Anderson v. Cagle's, Inc., 488 F.3d 945, 952 (11th Cir. 2007)).  Here, the parties stipulated to conditional certification and the Court determined that Plaintiff and the putative class members were sufficiently similarly situated for notice of the lawsuit to be sent.   (ECF No. 85.)

The second stage "is triggered by an employer's motion for decertification."  Id. at 1261(quoting Cagle's, 488 F.3d at 953).  At the second stage, the district court

"has a much thicker record than it had at the notice stage, and can therefore make a more informed factual determination of similarity." Id.  Although the plaintiff's burden of proving he and the opt-in plaintiffs are similarly situated is "heavier" than his burden at the first stage, the Eleventh Circuit has "refused to draw bright lines in defining similar" and "refused to "specify how plaintiffs' burden of demonstrating that a collective action is warranted differs at the second stage." Id.  The Eleventh Circuit emphasized that the "ultimate decision" to certify a collective action for trial "rests largely within the district court's discretion." Id. at 1261-62 (internal quotations omitted).

The Eleventh Circuit also recognized three factors that district courts should consider when deciding motions for decertification: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant that appear to be individual to each plaintiff; and (3) fairness and procedural considerations. Id.  These factors should be balanced with the fundamental purposes of the FLSA's collective action mechanism: to lower costs through the pooling of resources, and to limit the controversy to one proceeding to efficiently resolve common issues of law and fact that arose from the same alleged activity, i.e., the defendant's failure to pay the plaintiffs overtime pay. Kautsch v. Premier Commc'ns, 2008 WL 294271, at *2 (W.D. Mo. Jan. 31, 2008) (citing Moss

v. Crawford & Co., 201 F.R.D. 398, 410 (W.D. Pa. 2000)); Rikard v. U.S. Auto Prot., LLC, 2013 WL 5532688, at *3 (E.D. Mo. Oct. 4, 2013) (citing Kautsch); Simmons v. Valspar Corp., 2013 WL 2147862, at *5 (D. Minn. May 16, 2013) (same); Wilks v. Pep Boys, 2006 WL 2821700, at *3 (M.D. Tenn. Sept. 26, 2006) (citing Hoffmann-La Roche, Inc. v. Sperling, 493 U.S. 165, 170 (1989)); Nerland v. Caribou Coffee Co., Inc., 564 F. Supp. 2d 1010, 1026 (D. Minn. 2007) (citing Glass v. IDS Fin. Servs., Inc., 778 F. Supp. 1029, 1081-82 (D. Minn. 1991)).

Based on the factual record in this case—a factual record that consists of individualized testimony from all but one Plaintiff—the Court should deny Defendant's motion for decertification because Plaintiffs are in fact similarly situated to one another.

## II.    PLAINTIFFS ARE SIMILARLY SITUATED

### A.    Plaintiffs' Factual and Employment Settings are Nearly Identical and Minor Variations are Not Significant Enough to Warrant Decertification

As described *supra*, Plaintiffs were all employed by Defendant as ISRs in Norcross, Georgia, performing the same principal job duty, using the same primary computer programs, subject to similar if not identical performance metrics, in the same sales organization, led by the same executive.  Defendant uniformly classified ISRs as exempt then reclassified them to non-exempt, paid them in the same manner

(salary/commission and later hourly/commission), and subjected them to the same policies for recording their hours worked.  They all testified that they worked more than forty hours per week, and they overwhelmingly testified that Defendant's management-level employees were aware of their hours worked, encouraged or ordered them to work overtime hours, or told them that "FleetCor doesn't pay overtime."  In sum, Plaintiffs' factual and employment circumstances are strikingly similar and Plaintiffs should be allowed to proceed collectively against the Defendant.

Ignoring these unifying facts, Defendant argues that Plaintiffs cannot establish liability on a class-wide basis because they held different job titles (inbound versus outbound sales representatives), had different commission plans,[11] worked on different teams, and were supervised by different managers, all of which will impact their prima facie case and damages.  (Def.'s Mem. at 8-25.)

Defendant's exaggerated description of minor variances in Plaintiffs' work experiences must be contrasted with the overwhelming similarities among Plaintiffs. Indeed, courts recognize that "[i]f one zooms in close enough on anything,

---

[11] Defendant's argument that variations in the details of Plaintiffs' commission plans "will prevent this Court from applying a common formula to calculate damages" makes no sense.  (Def.'s Mem. at 16-18.)  The parties are in possession of each Plaintiff's payroll data, meaning that calculating their overtime wages owed is formulaic and may be done through rudimentary math after the fact-finder decides hours worked.

differences will abound ... But plaintiffs' claims need to be considered at a higher level of abstraction." Frank v. Gold'n Plump Poultry, Inc., 2007 WL 2780504, at *4 (D. Minn. Sept. 24, 2007); see also Butler v. DirectSAT USA, LLC, 2014 WL 4684337, at *7 (D. Md. Sept. 18, 2014); Thompson v. Bruister & Assocs., Inc., 967 F. Supp. 2d 1204, 1220 (M.D. Tenn. 2013) (quoting Frank and noting "Rare would be the collective action—or class action for that matter—where the employees labored under the exact same circumstances."); Khadera v. ABM Indus. Inc., 2011 WL 7064235, at *3 (W.D. Wash. Dec. 1, 2011) (quoting Frank); Andrako v. U.S. Steel Corp., 788 F. Supp. 2d 372, 381 (W.D. Pa. 2011) (same); Brennan v. Qwest Commc'ns Int'l, Inc., 2009 WL 1586721, at *3 (D. Minn. June 4, 2009) (same); Crawford, 2008 WL 2885230, at *8 (same); Kasten v. Saint-Gobain Performance Plastics Corp., 556 F. Supp. 2d 941, 957 (W.D. Wis. 2008) (same).

Contrary to Defendant's assertion, and unlike the facts of the cases it relies upon,[12] Plaintiffs have all testified in their interrogatories that they worked overtime

---

[12] Defendant cites Wallace v. Norcross Assocs., LLC, 2014 WL 1373659 (N.D. Ga. Apr. 8, 2014) for the proposition that decertification is appropriate because "individualized assessments would be required to determine liability." (Def.'s Mem. at 12.) Wallace is distinguishable because it is a decision denying conditional certification, not granting decertification, meaning that the evidence before the court regarding the similarity of the plaintiffs was so minimal that the plaintiffs could not even carry their lenient first stage burden. The evidence in this case consisting of individual testimony from all but one Plaintiff is indisputably far stronger. Reich v. Homier Distrib., Inc., 362 F. Supp. 2d 1009 (N.D. Ind. 2005) is distinguishable for

hours and Defendant's payroll records demonstrate that they were not paid for all of

the overtime hours they worked.  The differences raised by Defendant are trivial in

comparison.  As one court held in denying decertification:

> Contrary to Defendants' assertions, however, Plaintiffs' claims rely on a
> series of common methods by which Defendants allegedly deprived
> technicians proper overtime pay regardless of location or supervisor. …
> Plaintiffs across the class allege these same practices. Additionally, the
> plaintiff class comprises cable technicians tasked with the same job
> responsibilities and subject to pay under the same piece-rate system.
> Such a unifying set of facts and theories strongly counsels against
> decertification, notwithstanding certain variations in the factual
> circumstances of each individual plaintiff's situation.

Monroe v. FTS USA, LLC, 763 F. Supp. 2d 979, 995 (W.D. Tenn. 2011) (internal

citations omitted).  The same is true here, and decertification should be denied.

---

the same reason; in fact, the court could not even identify the potential class members
because their job duties were so varied.  Id. at 1014.  Other cases cited by Defendant
on motions for decertification are also distinguishable.  In Desilva v. North Shore-
Long Island Jewish Health Sys., Inc., --- F. Supp. 2d ----, 2014 WL 2534833
(E.D.N.Y. June 5, 2014), the court noted that the opt-in plaintiffs "worked in 395
departments in 39 business units at 59 locations . . . held 235 different positions . . .
were comprised of both union and non-union members, [and] worked on and off-
site."  Id. at *6.  Even if the Court were to zoom in on Plaintiffs' day-to-day
experiences as closely as Defendant asks it to, the differences would be minimal in
comparison to those in Desilva.  Similarly, the plaintiffs in Knott v. Dollar Tree
Stores, Inc., 897 F. Supp. 2d 1230 (N.D. Ala. 2012) worked in stores of varying sizes,
in different locations, and had differing job responsibilities that directly impacted
whether the executive exemption applied.  Here, Plaintiffs worked next to each other
and alongside management, performing nearly identical job duties in a single
location.

Defendant's reliance on this Court's decision in <u>Rindfleisch v. Gentiva Health Servs., Inc.</u>, 22 F. Supp. 3d 1295 (N.D. Ga. 2014), is also misplaced because it is highly distinguishable.  In terms of size and scope, the two cases are not even close: this case involves 77 plaintiffs who worked in one location in Georgia; <u>Rindfleisch</u> involved 999 plaintiffs who worked in states across the country.  <u>Id.</u> at 1300 n.3.  The facts are also very different.  Here, Plaintiffs worked in cubicles among their coworkers, supervisors, and senior management.  In <u>Rindfleisch</u>, the plaintiffs were clinicians who provided in-home care to the defendant's patients and were paid based on a "per visit" and "flat rate" basis.  <u>Id.</u> at 1299.  Perhaps most importantly, the evidence regarding hours worked is totally different.  In this case, Defendant did maintain any records of Plaintiffs' hours worked before June 201, and the records from June 2011 to July 2013 are inaccurate because managers who were purportedly tasked with visually determining Plaintiffs' work hours simply did not record them.  Further, here the parties disagree over the eligibility of only three Plaintiffs, whereas in <u>Rindfleisch</u>, the defendant maintained time records, and it was undisputed that they showed that "the vast majority of plaintiffs averaged fewer than 40 hours a week, and nearly one-third . . . never worked over 40 hours."  <u>Id.</u> at 1303.  The plaintiffs in <u>Rindfleisch</u> could thus never establish liability for all of the opt-in plaintiffs based on representative proof.  Here, however, Plaintiffs uniformly allege through sworn

testimony that they worked overtime hours and the evidence shows that it did not pay them overtime wages.

Such unifying facts demonstrate that Plaintiffs are similarly situated to one another to proceed to trial as a representative action.  Accordingly, the first factor weighs in favor of maintaining the collective action and denying Defendant's motion for decertification.

### B.   <u>Defendant May Present Its Defenses Collectively</u>

Defendant attempts to decertify this collective action by running through a list of purportedly individualized defenses.  (Def.'s Mem. at 26-32.)  For example, Defendant claims that individual trials are necessary to determine whether it had actual or constructive knowledge regarding any off-the-clock work, whether it willfully violated the FLSA, and because Plaintiffs' overtime estimates vary.  (<u>Id.</u>)  None of Defendant's purported defenses make trial of this collective action unmanageable or warrant decertification.

First, the common question of whether Defendant misclassified Plaintiffs as exempt from the FLSA's overtime protections before June 2011—a question which Defendant conveniently ignores for purposes of this motion only—can and should be adjudicated collectively.  <u>See Morgan v</u>, 551 F.3d 1233 (affirming district court's denial of decertification a misclassification case where evidence showed the plaintiffs

were similar in their day-to-day responsibilities and non-exempt duties);[13] Ruffin v. Avis Budget Car Rental, LLC, 2014 WL 294675, at *4 (D.N.J. Jan. 27, 2014) (concluding that where plaintiffs performed substantially similar duties, variations regarding certain aspects of their duties are immaterial differences in an exemption case).   Courts have also denied decertification in misclassification cases, in part, because of the employer's uniform classification decision that failed to consider each employee's individual circumstances.   See, e.g., Morgan, 551 F.3d at 1263 (noting that even the defendant perceived no distinction between the plaintiffs when it exempted all store managers from the FLSA without regard to store size, sale volume, region, district, or hiring or firing authority); Pendlebury v. Starbucks Coffee Co., 518 F. Supp. 2d 1345, 1352-53 (S.D. Fla. 2007) (finding the defendant's decision to classify all store managers as exempt based on the "job itself, not the incumbent performing the job" and without an individual inquiry to various store managers relevant to the plaintiffs' similarly situated status).

---

[13] In Morgan, the court held that "given the volume of evidence showing the store managers were similarly situated, and the fact that Family Dollar applied the exemption across-the-board to every store manager… Family Dollar [had] not shown clear error in the district court's finding that its defenses were not so individually tailored to each Plaintiff as to make [the] collective action unwarranted or unmanageable." Morgan, 551 F. 3d at 1263.

Here, although Defendant only addresses its individualized defenses to Plaintiffs' post-June 2011 claims, it uniformly asserts that Plaintiffs were properly classified as exempt before June 2011.  (See Def.'s Ans. p. 13 "Fifth Defense".) This central exemption issue will be decided based on common generalized proof and on a class-wide basis.  Further, in classifying all of its ISRs as exempt pre-June 2011, Defendant did not engage in any sort of individualized analysis, instead basing its decision on the way it classified its outside sales representatives.  (Citarella Dep. at 117-119.)  And, when Defendant reclassified its ISRs to non-exempt in May 2011, it did so across the entire inside sales organization.  (Id. at 123.)  Such broad brush decisions demonstrate Defendant's own perception that ISRs are sufficiently similar to one another and provide additional support for permitting Plaintiffs to continue to proceed collectively. See Morrison v. Ocean State Jobbers, Inc., 290 F.R.D. 347, 361 (D. Conn. 2013) (concluding the defendant's perception of the plaintiff's job as being sufficiently similar to support a single exemption determination is probative of the actual similarities among the plaintiffs); Nerland, 564 F. Supp. 2d at 1024 ("The Court finds it disingenuous for [Defendant], on one hand to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming that plaintiffs cannot

proceed collectively to challenge the exemption."). Plaintiffs' pre-June 2011 exemption status should be decided in a single proceeding.[14]

Second, even if the pre-June 2011 misclassification period was set aside, courts have repeatedly rejected the same allegedly individualized defenses Defendant raises against Plaintiffs' overtime claims after June 2011. See, e.g., McGlone v. Contract Callers, Inc., 2014 WL 4628829, at *3 (S.D.N.Y. Aug. 25, 2014) (refusing to decertify the collective where the defendants' actual or constructive knowledge defense was unlikely to vary between individual plaintiffs because they shared the same supervisors and the defendants' de minimis defense would also likely succeed or fail across the entire collective); Khadera, 2011 WL 7064235, at *3 (finding that "It is sufficient that Defendants were generally aware—either actually or constructively of the types of practices that Plaintiffs allege were used to deny them overtime"); Monroe, 763 F. Supp. 2d at 995-996 (noting that many of the defendants' purported defenses were "clearly amenable to classwide determination" and rejecting the defendant's claim that whether it had actual or constructive knowledge of the plaintiffs unpaid overtime could not proceed collectively); Andrako, 788 F. Supp. 2d at 382 (finding the defendant's contention that it could not try its offset and de

---

[14] Defendant has never identified the specific exemption that it contends applies to Plaintiffs. Regardless, Plaintiffs anticipate that the issue will be resolved before trial on cross-motions for summary judgment.

*minimis* defenses was weak because both are legal issues common to the class as a whole);[15] <u>Crawford</u>, 2008 WL 2885230, at *10 (concluding that collective adjudication was appropriate where the question of whether the defendant was aware of the plaintiffs' work was not "a particular defense raised against a specific plaintiff; rather it will be asserted against every member of the class" and its *de minimis* defense was susceptible of class-wide resolution); <u>Falcon v. Starbucks Corp.</u>, 580 F.

---

[15] Without citing to any evidence, Defendant claims it should be allowed to offset Plaintiffs' overtime damages because "evidence suggests that many Plaintiffs were likely paid for 40 hours in weeks in which they worked far less than 40 hours." (<u>See</u> Def.'s Mem. at 31.) Defendant's speculative offset theory goes to damages and is not sufficient for decertification. <u>See</u> <u>Maynor v. The Dow Chem. Co.</u>, 671 F. Supp. 2d 902, 937 (S.D. Tex. 2009) ("The absence of precise evidence of the full extent of each plaintiff's damages is not cause for decertification."). Moreover, Defendant cannot offset Plaintiffs' overtime damages with the regular wages they earned for non-overtime hours. <u>See</u> <u>Garcia v. Tyson Foods, Inc.</u>, 890 F. Supp. 2d 1273, 1294 (D. Kan. 2012) (analyzing the FLSA's offset provision found in 29 U.S.C. § 207(h), distinguishing <u>Singer v. City of Waco, Texas</u>, 324 F. 3d 813 (5th Cir. 2003) because it involved extra payments paid in excess of overtime compensation, and concluding that payments made as part of the regular rate of pay could not be used as an offset because they are not the type Congress expressly authorized to be used for offset treatment); <u>Martin v. PepsiAmericas, Inc.</u>, 628 F.3d 738, 742 (5th Cir. 2010) (clarifying the court's decision in <u>Singer</u> and affirming the court's disfavor for "set-offs unless the money being set-off can be considered wages that the employer pre-paid to the plaintiff-employee"); <u>see also</u> <u>Leite v. Tremron, Inc.</u>, 2012 WL 4049962, at *4 (S.D. Fla. Sept. 13, 2012) ("Any setoff that reduces the amount of overtime wages that the plaintiff is entitled to under the FLSA is therefore inappropriate."); 29 C.F.R. § 778.201(c) ("Section 7(h) [§ 207(h) ] of the Act specifically states that the extra compensation provided by these three types of payments may be credited toward overtime compensation due under section 7(a) for work in excess of the applicable maximum hours standard. No other types of remuneration for employment may be so credited.").

Supp. 2d 528, 540 (S.D. Tex. 2008) (determining that whether the plaintiffs' off-the-clock activities was compensable work, or whether defendant had actual or constructive knowledge of any off-the-clock work, or whether some of the off-the-clock work was *de minimis* were defenses that could adequately be raised at trial involving representative testimony); Wilks, 2006 WL 2821700, at *7 (rejecting the defendant's contention that it needed to confront each plaintiff individually to defend against the plaintiffs' off-the-clock claims because the defendant would be free to present evidence, cross-examine individual plaintiffs, and call other witnesses to defend its policies and procedures at a single trial).

The same result should be reached in this case.  Through a collective trial, Defendant is free to raise its defenses by cross-examining representative Plaintiffs about the hours they worked, and challenging their good-faith estimates.  Defendant may also present its own evidence and witnesses for any of its defenses, including its defenses to Plaintiffs' claim that Defendant knew or should have known that Plaintiffs worked uncompensated overtime hours, and Plaintiffs' claim that Defendant willfully violated the law when Plaintiffs' supervisors underreported

Plaintiffs' work hours and discouraged Plaintiffs from accurately reporting their overtime hours.[16]

Moreover, Defendant's challenges to Plaintiffs' credibility[17] fail because credibility issues are not individualized defenses that weigh in favor of decertification. See Pendlebury, 518 F. Supp. 2d at 1362 (concluding that contradictions are matters of credibility for the factfinder, not individualized defenses); see also Monroe, 763 F. Supp. 2d at 996 (finding that the use of representative testimony in a collective action will not impair the defendants' ability to effectively raise credibility issues).[18] Based on the FLSA's remedial policy, the

---

[16] Defendant's reliance on Tracy v. NVR, Inc., 293 F.R.D. 395, 299 (W.D.N.Y. 2013) is misplaced. Unlike here, in Tracy, the defendant did not have a policy or practice relative to hours worked and kept no time records. Id. at 399. Here, the evidence shows that Plaintiffs worked overtime hours with Defendant's knowledge but Defendant did not record overtime hours or pay Plaintiffs overtime wages (except for very few discrete instances). (See Miller Dep. 80:14-81:11, 85:13-86:15, 87:11-15, 89:25-91:14; Green Dep. 49:14-52:19, 80:1-20, 88:9-25; Ex. 1; Selanor Aff. ¶ 10.)

[17] Defendant's "evidence" of Plaintiffs' purported credibility issues—selections without context from two Plaintiffs' depositions and allegations in a declaration that certain unnamed Plaintiffs were terminated for various untoward reasons—is objectionable, irrelevant, and likely inadmissible.

[18] In Monroe, approximately 300 cable television installation technicians alleged that their supervisors violated the FLSA by requiring them to underreport their hours worked and/or altering their timesheets after they submitted them. Id. at 983-94. The defendants argued that the collective action should be decertified "because the finder of fact must assess the credibility of each plaintiff individually as to how much, if any, uncompensated overtime he or she worked." Id. at 995.

court in <u>Monroe</u> found that the use of representative testimony would not impair the

defendants' ability to address credibility issues and explained:

> While it will not afford the same level of forensic specificity as cross-examination of each plaintiff individually, a collective action under § 216(b) is not held to the same rigors as either a typical lawsuit or a class action under Rule 23 precisely because the FLSA contemplates that representative testimony may be used to adjudicate the claims of nontestifying plaintiffs and thereby arrive at an approximation of damages.

<u>Id.</u> at 966 (citing <u>O'Brien v. Ed Donnelly Enters., Inc.</u>, 575 F.3d 567, 585 (6th Cir.

2009)).  The same rationale applies here.

Third, Defendant's arguments about Plaintiffs' varied overtime hours go to

damages and are insufficient for decertification.   See <u>O'Brien</u>, 575 F.3d at 585

(recognizing that "it is possible that representative testimony from a subset of

plaintiffs could be used to facilitate the presentation of proof of FLSA violations,

when such proof would ordinarily be individualized"); <u>U.S. Dep't of Labor v. Cole</u>

<u>Enters., Inc.</u>, 62 F.3d 775, 781 (6th Cir.1995) ("[t]he testimony of fairly

representative employees may be the basis for an award of back wages to

nontestifying employees"); <u>White v. NTC Transp., Inc.</u>, 2013 WL 5874566, at *9

(N.D. Miss. Oct. 31, 2013) ("Concerns as to individual damages calculations do not

prevent this action from fairly and efficiently proceeding collectively at the liability

stage and may be properly addressed at the damages stage."); <u>Metcalfe v. Revention,</u>

Inc., 2012 WL 3930319, at *6 (S.D. Tex. Sept. 10, 2010) ("Whether individualized determinations are necessary to define the extent of Plaintiffs' damages, if any, does not weigh against efficiently establishing Defendants' class-wide liability"); Maynor, 671 F. Supp. 2d at 934 ("The need for individual plaintiffs to establish the amount of uncompensated time does not defeat certification.").

Here, Defendant cannot dispute that it has failed to meet its burden of keeping accurate records of Plaintiffs' hours worked.  As such, damages in this case will be approximate and shown "as a matter of just and reasonable inference" and testifying representative Plaintiffs may establish damages for the non-testifying ones.  See Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 686-88 (1946) (establishing the burden-shifting framework where an employer is found to have kept inaccurate or inadequate records and explaining that "[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of . . . the [FLSA]"); Morgan, 551 F.3d at 1279-80 (finding that once plaintiffs meet their § 216(b) "similarly situated" standard, they are "similarly situated enough to testify as representatives of one another"); see also Reich v. S. New England Telecomm. Corp., 121 F.3d 58, 67 (2d Cir. 1997) (where the defendants failed to track their employees' hours, "it is well-established that the [plaintiff] may present the testimony of a

representative sample of employees as part of his proof of the prima facie case under the FLSA.").  As one court recently determined in denying decertification:

> Defendants cannot support their decertification motion with claims that representative proof is inadequate to accurately assess the extent of their liability when [defendant's] failure to track its employees' hours is the reason representative proof is necessary.  Decertification on those grounds would unjustly penalize the plaintiffs and reward defendants for their failure to keep records.

Johnson v. Wave Comm GR, LLC, 4 F. Supp. 3d 453, 461 (N.D.N.Y. 2014).

Fourth, the possibility of a two versus three-year statute of limitations (29 U.S.C. § 255(a)) does not justify decertification, especially where if liability is determined, the statute of limitations for each plaintiff can be readily ascertained.[19]

---

[19] Defendant's argument that the entire collective should be decertified because a handful of Plaintiffs may be ineligible should be summarily rejected. (See Def.'s Mem. at 10, 28.)  As explained *supra* fn 1, the parties actually agree that two of these plaintiffs should be dismissed (Sandra Siddell and Tara Gray).  With respect to Janice Gardner, Stacey Green, and Kenneth Williams, their eligibility can easily be determined by the Court on a motion to dismiss or a motion for summary judgment.  Regardless, even if their claims are time-barred, that simply means that they do not have claims; it does not warrant decertification of the rest of the similarly situated collective.  Indeed, in O'Brien, a case involving off-the-clock claims, the Sixth Circuit appropriately concluded:

> [D]istrict courts should examine whether partial decertification is possible, when faced with the situation where a subset of the plaintiffs fail to allege violations of the FLSA. The option of partial certification is important to consider, because it counters the argument that a collective action must be totally decertified if some members are not similarly situated to the others. In general, plaintiffs who are not similarly situated

See Escobedo v. Dynasty Insulation, Inc., 2009 WL 2382982, at *7 (W.D. Tex. July 31, 2009); (concluding the defendant's defense to willfulness was relevant to all plaintiffs' claims and would be more efficiently made in a collective action); Johnson, 4 F. Supp. 3d at 460 ("It would be inefficient to deny the collective adjudication of these claims merely because the statute of limitations must be applied to each plaintiff individually when determining damages.").

Last, Defendant's judicial estoppel defense is a question of law that does not require individual trials.  See Indergit v. Rite Aid Corp., 293 F.R.D. 632, 649-650 (S.D.N.Y. 2013) (holding that judicial estoppel is not the sort of individualized defense that requires decertification, because it affects only damages, not liability and "whether an opt-in's claims were discharged due to the bankruptcy disclosures . . . would be subject to generalized proof, and the question of judicial estoppel itself is one of law, that could be determined by the Court in one instance."); Crawford, 2008

—for instance, plaintiffs who did not allege suffering under either unlawful practice—could be dismissed while keeping intact a partial class. Plaintiffs who do present evidence that they are similarly situated to the lead plaintiffs should not be barred from the opportunity to be part of a FLSA collective action, because the collective action serves an important remedial purpose. Through it, a plaintiff who has suffered only small monetary harm can join a larger pool of similarly situated plaintiffs.

575 F.3d at 586 (citing Hoffmann–La Roche, Inc., 493 U.S. at 170).

WL 2885230, at *11 (E.D. Ky. July 22, 2008) (noting that the "lack of standing due to bankruptcy filings would not require individualized proof at trial" because "the effect of the bankruptcy filings of [the plaintiffs] is a legal question for the court.") (citation omitted).

This second decertification factor weighs in Plaintiffs' favor, and Defendant's motion should be denied.

### C. Fairness and Procedural Considerations Weigh Heavily in Favor of Collective Adjudication

Defendant misunderstands the concept of representative testimony and proof. Contrary to Defendant's contentions, Plaintiffs need only show that they are similarly situated to one another in order for representative proof to be appropriate. Once a court determines the plaintiffs are sufficiently similarly situated to proceed to trial collectively, the plaintiffs may present their case based on representational proof. See Morgan, 551 F.3d at 1279-80 (concluding that once plaintiffs satisfied their § 216(b) "similarly situated" standard, they are "similarly situated enough to testify as representatives of one another"); O'Brien, 575 F.3d at 585 (recognizing that representative testimony from a subset of plaintiffs could be used to facilitate the presentation of proof of FLSA violations, when such proof would ordinarily be individualized) (citing Morgan, 551 F.3d at 1279-80); Monroe, 763 F. Supp. 2d at 996 ("plaintiffs who testify will do so in a representative capacity, and the issues

Defendants raise concerning the nature and extent of the plaintiffs' alleged uncompensated overtime may be broached with the testifying plaintiffs . . . [A] collective action under § 216(b) is not held to the same rigors as either a typical lawsuit or a class action under Rule 23 precisely because the FLSA contemplates that representative testimony may be used to adjudicate the claims of nontestifying plaintiffs and thereby arrive at an approximation of damages.") (citations omitted). Thus, if a collective is similarly situated and share a common claim that they worked uncompensated overtime hours, each opt-in plaintiff **is not required** to present evidence of precisely why or how the defendant failed to pay him overtime in order for the testifying plaintiffs' testimony to be extrapolated to the non-testifying plaintiffs. This is how FLSA cases are tried. See, e.g., Morgan, 551 F.3d at 1278-79 (concluding that the general rule is that not all employees have to testify to prove overtime violations); Reich, 121 F.3d 58 (2d Cir. 1997) ("it is well-established that the Secretary may present the testimony of a representative sample of employees as part of his proof of the prima facie case under the FLSA"); McLaughlin v. Ho Fat Seto, 850 F.2d 586, 589 (9th Cir. 1988) (finding that the non-testifying employees established a prima facie case that they had worked unreported hours through the testimony of five plaintiffs); Martin v. Selker Bros., Inc., 949 F.2d 1286, 1298 (3d Cir. 1991) ("It is not necessary for every single employee to testify in order to prove

violations or recoup back wages.  The testimony and evidence of representative employees may establish prima facie proof of a pattern and practice of FLSA violations."); Donovan v. Bel-Loc Finer, 780 F.2d 1113, 1116 (4th Cir. 1985) (recognizing that requiring each plaintiff to testify would thwart the purposes of the sort of representational testimony clearly contemplated by Mt. Clemens Pottery); Stillman v. Staples, Inc., 2009 WL 1437817 (D.N.J. May 15, 2009) (finding FLSA violations and awarding back wages based on representative proof); Takacs v. Hahn Auto. Corp., 1999 WL 33127976, at *1 (S.D. Ohio Jan. 25, 1999) (citing cases) ("Based upon Mt. Clemens Pottery, courts, including the Sixth Circuit, have uniformly held that damages in an FLSA overtime case can be proved, with testimony from a representative group of plaintiffs and, thus, without requiring each plaintiff seeking same to testify").  Consistent with these cases, Plaintiffs intend to prove their damages through representative testimony.[20]

---

[20] Despite these sound decisions regarding representative proof in FLSA cases, Defendant relies on two cases, Espenscheid v. DirecSat USA LLC, 705 F.3d 770 (7th Cir. 2013) and Comcast Corp. v. Behrend, 133 S. Ct. 1426, 1428 (2013), that have no bearing on this case.  (Def.'s Mem. at 36.)  Indeed, Comcast was not an FLSA case and instead involved a Rule 23(b)(3) analysis and stands for the "unremarkable premise" that a putative class's proposed damages methodology must be consistent with its theory of liability.  Id.  Importantly, Comcast did not unravel the burden-shifting framework for proving FLSA damages espoused in Mt. Clemens Pottery.  See Driver v. AppleIllinois, LLC, 2013 WL 5818899, at *12 (N.D. Ill. Oct. 29, 2013) ("There is no indication in Comcast that the Court intended to undo the 67 years of decisions setting [wage-and-hour] damages under the burden-shifting framework of

Defendant also claims that Plaintiffs are required to have personal knowledge of other Plaintiffs' employment situations. (Def.'s Mem. at 34-36.) Defendant is wrong. First, Plaintiffs Miller and Green did not admit that they are not representative. That is a legal question for the court to decide. Second, and more importantly, none of the three decertification factors interjects a personal knowledge requirement in order for the court to determine that the plaintiffs are similarly situated to one another. Third, Plaintiffs testified that they did have personal knowledge of other ISRs. For example, Plaintiff Miller testified that his habits and routine were the same as other ISRs, and that he observed many other ISRs working late, just like he did. (Miller Dep. 66:22-67:17, 89:4-24.) Likewise, Plaintiff Green testified that she observed other ISRs working through lunch and late in the evening. (Green Dep. 25:11-17, 60:4-21, 90:1-21, 95:17-20.)

---

Mt. Clemens….").  Damages in this case will be approximate and shown "as a matter of just and reasonable inference" because Defendant failed to meet its burden of keeping accurate time records. See Mt. Clemens, 328 U.S. at 686-688 ("[t]he employer cannot be heard to complain that the damages lack the exactness and precision of measurement that would be possible had he kept records in accordance with the requirements of . . . the [FLSA].")  Further, unlike the limited scope of this case, Espenscheid consisted of 2,341 class members, twelve different subclasses, and "divergent testimony, distinct theories of liability, [and] unique employment environments and experiences." 705 F.3d at 772; Espenscheid v. DirecSat USA LLC, 2011 WL 2009967, at *5 (W.D. Wis. May 23, 2011).  Because Plaintiffs are similarly situated, damages in this case may be easily calculated using Defendant's own payroll records after the jury determines liability and the only fact question relevant to the calculation of damages, i.e., the number of unrecorded hours worked by the testifying representative plaintiffs.

## CONCLUSION

For all of the reasons stated above, Plaintiffs respectfully request that the Court

deny Defendant's motion.

Dated: January 2, 2015

**NICHOLS KASTER, PLLP**

s/Timothy Selander
Rachhana T. Srey, MN Bar #340133*
rsrey@nka.com
Timothy Selander, MN Bar #387016*
selander@nka.com
4600 IDS Center,   80 South 8th Street
Minneapolis, MN 55402
Telephone: (612) 256-3200
Fax: (612) 215-6870

*Admitted *Pro Hac Vice*

**AUSTIN & SPARKS, P.C.**
John T. Sparks, GA Bar # 669575
2974 Lookout Place N.E., Suite 200
Atlanta, GA 30305
Telephone: (404) 869-0100
jsparks@austinsparks.com

**ATTORNEYS FOR PLAINTIFF
AND THOSE SIMILARLY
SITUATED**

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | | |
|---|---|---|
| **KEITH MILLER, individually and** | § | |
| **on behalf of all other similarly** | § | |
| **situated individuals,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **Civil Action No. 1:13-cv-2403-SCJ** |
| | § | |
| **FLEETCOR TECHNOLOGIES** | § | |
| **OPERATING COMPANY, LCC** | § | |
| | § | |
| **Defendant.** | § | |

## CERTIFICATE OF SERVICE AND LR 5.1C COMPLIANCE

I HEREBY CERTIFY that in preparation of this filing, I used MS Word 2010, Times New Roman 14 point font specifically applied to include all text, including headings, footnotes, and quotations. I further certify that on January 2, 2015, I electronically filed the foregoing Plaintiffs' Opposition to Defendant's Motion for Decertification with the Clerk of Court using the CM/ECF system, which will send electronic notice to the following counsel of record:

PHELPS DUNBAR, LLP
Dennis M. McClelland
100 South Ashley Drive, Suite 1900
Tampa, Florida 33602
Telephone: (813) 472-7550

Susan W. Furr
Jessica C. Huffman
II City Plaza, Suite 1100
Post Office Box 4412
Baton Rouge, Louisiana 70802
Telephone: (225) 346-0285

POLSINELLI PC
James J. Swartz, Jr.
Teeka K. Harrison
1355 Peachtree Street, N.E., Suite 500
Atlanta, Georgia 30309
Telephone: (404) 253-6000


s/Timothy C. Selander
Counsel for Plaintiffs