IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

KEITH MILLER, individually and on behalf :
of all other similarly situated individuals,
:
    Plaintiff, :
:   CIVIL ACTION FILE
v. :   NO. 1:13-CV-2403-SCJ
:
FLEETCOR TECHNOLOGIES :
OPERATING COMPANY, LLC,, :
:
    Defendant. :

## ORDER

This matter is before the court on Defendant's motion for decertification [146].

**I.   Background**

    **A.   Procedural History and Relevant Facts**

On July 18, 2013, Plaintiff, Keith Miller, filed suit against Defendant FleetCor Technologies Operating Company, alleging Defendant was liable to him for overtime payments under the Fair Labor Standards Act. On December 20, 2013, the parties stipulated to conditional certification of a class described as "any individual who worked for Defendant FleetCor Technologies Operating Company, LLC, in Norcross, Georgia, in the position of 'Inside Sales Representative' or 'Outbound Sales Representative' at any time from December 15, 2010, to August 1, 2013." The

court approved the stipulation on April 8, 2014. See Doc. No. [85]. The number of opt-ins is presently 77 current and former employees of FleetCor. The parties engaged in a period of discovery which included interrogatory responses from almost all Plaintiffs, depositions of two Plaintiffs, and a deposition of Defendant's corporate designee. Defendant then filed the instant motion for decertification, contending that Plaintiffs' claims cannot be resolved on a collective basis. Opt-in Plaintiffs Sandra Siddell and Tara Grey dismissed their claims with prejudice after the parties briefed Defendant's motion for decertification.

Defendant FleetCor provides credit card services to businesses with fleets of vehicles. These businesses use Defendant's "fleet cards" to track fuel expenditures by workers who purchase fuel as part of their duties. Defendant employs "inside sales representatives" all of whom work at the Norcross headquarters. Based on the origin of the sales lead, the inside sales representatives are divided into two groups: inbound and outbound sales representatives. Outbound sales representatives do "cold calling" and networking, while inbound representatives sell through incoming calls and "warm leads." Inbound sales has between two to four teams based on the source of the leads. Outbound has eight different teams organized by product sold. Each team has a different manager. Inside sales representatives report to team leads, who in turn report to a director or senior

manager. The directors or senior managers report to Paul Citarella, Senior Vice President of Sales. Mr. Citarella has held this position since 2008. All of these supervisors, as well as the inside sales representatives, work near each other in cubicles at the Norcross headquarters. Mr. Citarella works in an office on the same floor as many of the representatives.

Inside sales representatives use three computer programs in their work: Microsoft Outlook (for email), GADD (a computer program which allows representatives to make calls from their computers and tracks those calls), and SalesForce.com (a web based customer management tool). The representatives earn commissions based on the number of gallons of fuel sold. The commission structure is the same across all representatives, although different representatives have different sales requirements.

Prior to June 3, 2011, Defendant classified all inside sales representatives as "exempt" and did not record their hours. After June 2011, Defendant reclassified all inside sales representatives as "non-exempt." At the time of reclassification, Defendant met with all inside sales representatives to explain the change and new timekeeping practices. Defendant also instructed sales representatives that they were not to work more than 40 hours per week without the approval of their manager. Managers were told to submit their employees' hours bi-weekly.

Defendant's written policy indicated that employees were to complete a timesheet of all hours worked, including overtime hours, and submit that to their manager. But Defendant admits that in practice, managers actually reported hours worked based on their "visual" observations of each employee's arrival, lunch break, and departure times. Employees did not began submitting their own timesheets until July 29, 2013, the end of the collective action period.

Almost every Plaintiff submitted interrogatory responses to Defendant. In Plaintiffs' response brief, the portions of those interrogatory responses related to management instructions or statements concerning overtime pay are excerpted. See Doc. No. [148], at 11-16 n.10. The court further discusses those responses below.

Plaintiffs further state that a review of the payroll records of all 77 Plaintiffs between June 3, 2011 and December 27, 2013, shows that Defendant recorded a total of 17 hours of overtime (worked by four Plaintiffs) for the approximately 4,750 weeks worked by all Plaintiffs during that time period.

### B. Contentions

Defendant argues that the court must decertify the class because Plaintiffs worked two different types of jobs (inbound and outbound sales) which had different schemes of compensation during different times periods in the class (salary plus commission or hourly plus commission). Defendant further avers that Plaintiffs had numerous different supervisors who paid varying attention to

whether Plaintiffs worked overtime and varied in the degree to which they encouraged overtime, and thus, whether Defendant had actual or constructive knowledge of overtime cannot be determined on a collective basis. Defendant also remarks that it has individualized defenses to Plaintiffs' claims. Defendant contends that it is not liable to at least two Plaintiffs who cannot meet the three year statute of limitations for willful violations of the FLSA. It argues an additional ten Plaintiffs have claims outside of the two year statute of limitations period. Other Plaintiffs were terminated for fraud-like offenses that would go to their credibility. With respect to some Plaintiffs, Defendant intends to raise an offset claim. Finally, Defendant says several Plaintiffs are estopped from bringing their overtime claims because they failed to include the FLSA claims in their bankruptcy petitions.

Plaintiffs respond that the collective action should proceed because they are all inside sales representatives who had the same job duties and Defendant did not make any effort to track their hours. Nearly all Plaintiffs responded to interrogatories stating that they were consistently encouraged by their various supervisors to work overtime hours even though they were told they would not be paid overtime wages. Each of their managers reported to a single executive who was in charge of the inside sales program and was involved in the day-to-day operation of the inside sales team. Plaintiffs were all classified initially as exempt

and then reclassified as non-exempt and Plaintiffs aver that whether the initial "exempt" classification was appropriate also should be decided on a collective basis.

## II. Discussion

The FLSA authorizes collective actions against employers alleged to have violated the Act. See 29 U.S.C. § 216(b). Once a plaintiff files a complaint, any other similarly situated employees who want to join must affirmatively consent to be a party and file such consent with the court. See, e.g., Albritton v. Cagle's, Inc., 508 F.3d 1012, 1017 (11th Cir. 2007).

The Eleventh Circuit has "sanctioned a two-stage procedure for a district court to effectively manage FLSA collective actions in the pretrial phase." Morgan v. Family Dollar Stores, Inc., 551 F.3d 1233, 1260 (11th Cir. 2008). "The first step of whether a collective action should be certified is the notice stage. . . . Here, a district court determines whether other similarly situated employees should be notified." Id. In the first stage, the plaintiff "has the burden of showing a 'reasonable basis' for his claim that there are similarly situated employees." Id. (noting that courts apply a "fairly lenient standard" at this stage).

"The second stage is triggered by an employer's motion for decertification." Id. at 1261. Because the court and the parties have the advantage of a more established record than exists at the notice stage, the court makes "a more informed

factual determination of similarity." Id. "This second stage is less lenient, and the plaintiff bears a heavier burden." Id. (quotations and citations omitted).

In Anderson v. Cagle's, Inc., 488 F.3d 945 (11th Cir. 2007), the court declined to specify precisely just how much "less lenient" the standard was at the decertification stage. But the court did say that "logically, the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action." Id. at 953. Although "the FLSA does not require potential class members to hold identical positions," they must share more than job duties and manner of pay. Id. "Otherwise, it is doubtful that § 216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse." Id.

The Anderson court also cited with approval three factors considered by the court in Thiessen v. General Electric Capital Corp., 267 F.3d 1095, 1103 (10th Cir. 2001): "(1) disparate factual and employment settings of the individual plaintiffs: (2) the various defenses available to defendants that appear to be individual to each plaintiff, and (3) fairness and procedural considerations." Id. Ultimately, however, "whether a collective action is appropriate depends largely on the factual question of whether the plaintiff employees are similarly situated to one another." See Morgan, 551 F.3d at 1262. To satisfy the "similarly situated" standard, Plaintiffs

7

must establish <u>inter alia</u> "liability on a class-wide basis." <u>See Rindfleisch v. Gentiva Health Services, Inc.</u>, 22 F. Supp. 2d 1295, 1303 (N.D. Ga. 2014) (Jones, J.) (citing <u>Briggins v. Elwood TRI, Inc.</u>, 882 F. Supp. 2d 1256, 1267 (N.D. Ala. 2012)).

Finally, the <u>Morgan</u> court noted that addressing whether a collective action is fair "also requires looking to the purposes of § 216(b) actions under the FLSA: (1) reducing the burden on plaintiffs through the pooling of resources, and (2) efficiently resolving common issues of law and fact that arise from the same illegal conduct." <u>See Morgan</u>, 551 F.3d at 1264-65. "We also bear in mind that the FLSA is a remedial statute that should be liberally construed." <u>Id.</u> at 1265 (citation omitted).

Here, there are many common facts which lead the court to conclude that Plaintiffs are "similarly situated." There is no doubt that Plaintiffs have similar job responsibilities and work structure. The fact that Defendant classified them collectively as exempt and then again collectively as non-exempt shows that Defendant also views their jobs similarly. Clearly, the issue of whether Defendant improperly classified Plaintiffs' positions as "exempt" prior to June 2011 is capable of collective determination for the same reasons as the court found a collective action proper in <u>Morgan</u>.

8

Furthermore, Defendant admits that it made no effort to track the hours worked by Plaintiffs, even after it classified them as non-exempt. Although Defendant's policy stated that employees should submit time bi-weekly, Defendant agrees that no timesheets were used and Plaintiffs' supervisors instead tracked time through "visual" observation. Thus, Plaintiffs are similarly situated in that there are no records to show hours worked. All Plaintiffs did use the same computer software programs which track when Plaintiffs began making sales calls and when those calls happened during the day. Therefore, to the extent there may be any helpful records from Defendant, they can be extracted from the computer programs used by all sales representatives.

While it may be true that this will require analysis of call log activity on an individualized basis, the court finds this is an issue more related to damages than liability. It is clear from the interrogatory responses filed by Plaintiffs that they will testify that on at least one occasion, they each worked more than 40 hours in one week and that management encouraged an environment of overtime work. If a jury were to believe this testimony, it could reach a conclusion as to liability. A review of the call logs might be necessary to determine amount of hours overtime worked. The court can also imagine a circumstance where a plaintiff has testified that he or she worked overtime every single week and FleetCor might use call logs to impeach

this testimony. But the mere fact that Defendant might reference an individual call log in the liability phase still does not render the litigation unsuitable for collective action.

Another factor counseling in favor of collective action is that all Plaintiffs were compensated in the same manner. Prior to June 2011, they were paid salary with commission. After June 2011, they were paid hourly with commission. It is typical of any FLSA action that once liability is established, there will be individualized calculations based on the number of hours of overtime worked per week and the varied level of money earned. Those facts do not render a collective action inappropriate.

Although Defendant argues the commission structure differed between inbound and outbound sales because the quotas and amount of commissions differed, Defendant has not explained how these differences would unduly burden a calculation of damages based on overtime hours. Moreover, Plaintiffs have averred that the pay structure was the same for all inside sales representatives, the only difference being various sales quotas. If that is the case, the commission structure does not adversely impact a collective action. For example, the fact that different members of a collective action might have varying hourly salaries does not complicate the calculation of damages just like the fact that one employee worked

AO 72A
(Rev.8/82)

ten hours of overtime per week and another worked only five does not lessen the suitability of a collective action.

Finally, the interrogatory responses provided by Plaintiffs are notable in their near-uniformity that various managers told Plaintiffs that this was not a "9 to 5" job and that they needed to do whatever work necessary to meet quotas. These requirements were not isolated to a few managers, but rather were instructions received across the board by Plaintiffs, including from Paul Citarella, Defendant's Senior Vice President of Sales since 2008.

The record also contains objective evidence that Defendant did not pay overtime to its inside sales representatives. Payroll records of all 77 Plaintiffs between June 3, 2011 and December 27, 2013, shows that Defendant recorded a total of 17 hours of overtime (worked by four Plaintiffs) for the approximately 4,750 weeks worked by all Plaintiffs during that time period. In light of the work hours of all 77 Plaintiffs, 17 hours of overtime is so negligible as to be non-existent.

Defendant does raise various arguments as to why Plaintiffs have some individual characteristics. But the standard is not exact likeness among Plaintiffs; the standard is substantially similar. As the court explains below, none of the individual features addressed by Defendant would make this action more efficient or suitable as 77 individual cases as opposed to one collective action.

11

As an initial matter, several of Defendant's proffered arguments for why collective action would be inappropriate would actually have no impact "collectively." Defendant contends that because some Plaintiffs state they worked overtime at home and some worked on nights and weekends, their claims cannot be analyzed collectively. Defendant also avers that because inbound and outbound sales representatives developed their leads in different ways, this cannot be a collective action. Further, because some representatives worked overtime for portions of the relevant time period but not consistently throughout, Defendant states the court cannot handle the claims collectively. The court disagrees. The fact that it might be "easier" to sell as an inbound representative has no connection to whether inbound and/or outbound representatives worked overtime. Similarly irrelevant is the fact that the teams had different quotes, sold different products, had customers in different time zones, or worked different amounts of overtime. In this case, the reasons why an employee worked overtime are not relevant to whether the action should be determined on a collective basis.

Defendant also contends that there are at least ten Plaintiffs whose claims would be barred by an application of the two year statute of limitations period. At this stage in the litigation, however, the court (or potentially, the jury) has not been asked to determine whether Defendant's actions were "willful." As a result, the

claims of those Plaintiffs who fall between the two year and three year statute of limitations are still viable. The court views Defendant's claims concerning judicial estoppel in the same manner. Until the court can fully determine whether judicial estoppel applies to certain Plaintiffs, those Plaintiffs still have potential claims.

Defendant suggests that several Plaintiffs have "serious credibility issues." See Doc. No. [146], at 29-31. With certain Plaintiffs, Defendant takes issue with some estimations of how many hours of overtime worked per week; with others, Defendant alleges that they were terminated or resigned for reasons that would reflect on credibility. These are issues that can be addressed to the relevant Plaintiffs on cross examination. They do not broadly impact whether Defendant might be liable to the class of inside sales representatives on a collective basis. The court finds the same with respect to Defendant's defenses of offset (if even possible under the FLSA) and de minimis time.

More substantively, Defendant argues that several Plaintiffs could not establish any liability at all. In Rindfleisch, this court made it clear that "every Plaintiff has to actually be owed overtime compensation in a collective action solely seeking overtime damages." 22 F. Supp. 2d at 1303. A "collective action is improper when actual liability cannot be established on a class-wide basis." Id. As "a general rule, a group of opt-in plaintiffs cannot be similarly situated for purposes

13

of a collective action when individual determinations regarding liability must be made." Id. (citing Reich v. Homier Distrib. Co., 362 F. Supp. 2d 1009, 1013-14 (N.D. Ind. 2005)).

Defendant contends that named-Plaintiff Miller "even . . . acknowledged that some of the other Outbound Sales Representatives may not have worked over 40 hours in a week." See Doc. No. [146], at 11. But the portion of Miller's testimony cited by Defendant does not acknowledge that. Rather, Miller testified that "not everybody's going to work the exact same time I worked" and agreed that he could not estimate the amount of overtime worked by other representatives. See Miller Depo., at 113. His testimony does not concede that other representatives may not have worked over 40 hours in a week.

Defendant avers that Sandra Siddell did not start working for FleetCor until after the cut-off date for the collective action. Further, Defendant argues that Tara Gray's and Stacey Green's claims are barred even under the extended three year statute of limitations period. Finally, Defendant states that Janice Gardner only worked for FleetCor for one day and therefore could not have a claim that she worked more than 40 hours in one workweek. In response, Plaintiffs did drop the claims of Sandra Siddell and Tara Gray, but not the other individuals mentioned here. However, based on the nature of the argument raised by Defendant, the court

14

finds that whether Stacey Green and Janice Gardner can establish liability is likely an issue that can be resolved on motions for summary judgment.

Under the FLSA, "if the employer knows or has reason to believe that the employee continues to work, the additional hours must be counted." Reich v. Dep't of Conservation & Nat. Res., 29 F.3d 1076, 1082 (11th Cir. 1994) (citing 29 C.F.R. § 785.11). A plaintiff must demonstrate that (1) he worked overtime without compensation and (2) the employer knew or should have known of the overtime work. See, e.g., Allen v. Board of Public Education for Bibb County, 495 F.3d 1306 (11th Cir. 2007); see also 29 C.F.R. § 785.11 (interpreting "suffer or permit to work" requirement to mean that employer violates FLSA when it "knows or has reason to believe that he is continuing to work and the time is working time"). See also Bailey v. TitleMax of Georgia, Inc., 776 F.3d 797, 801 (11th Cir. 2015) ("If an employer knew or had reason to know that its employee underreported his hours, it cannot escape FLSA liability by asserting equitable defenses based on that underreporting."). The Court has previously held that if individual plaintiffs received different instructions from different managers, collective determination might now be appropriate. See Willoughby v. Youth Villages, Inc., ___ F. Supp. 3d ___, 2015 WL 4127276 (N.D. Ga. June 26, 2015) (granting motion to decertify where "different supervisors gave employees different instructions on where to report

15

corrections to time records, whether to 'refuse' breaks or not, and how to use break logs").

Here, although Defendant contends that different managers had varying policies and practices such that Plaintiff could not identify "any uniform policy or practice" requiring all representatives to work more than 40 hours in a workweek, the evidence collected by Plaintiffs in their interrogatory responses sufficiently rebuts that argument. Plaintiffs all responded that management informed them quotas had to be met regardless of number of hours worked and that to be successful in the job, an employee would have to work overtime. All of the inside sales representatives, including the managers and Senior Vice President of Sales, worked in the same general area of the building and would likely have knowledge of employees working outside of regular business hours. That testimony coupled with the fact that FleetCor paid only 17 hours total overtime (to four employees) for all Plaintiffs during the collective action period goes some ways toward showing the potential of a "practice."

Defendant argues that Plaintiff Kenneth Williams testified that his manager, Kenneth Matthews, "was the manager who directly supervised him when he allegedly worked overtime." See Doc. No. 146, at 10. Defendant then goes onto state that Williams was supervised by Matthews only for the period of June 2008

through December 2009 which is outside of the three year statute of limitations period for Williams. However, Williams's interrogatory response does not refer only to Matthews. Williams wrote that he "recalls that every week Kenneth Matthews and Paul Citarella would instruct sales representatives not to leave until their goals were completed." See Doc. No. [146], Exh. 7, Part D, at 424-26. Mr. Citarella has managed the sales team throughout the collective action period.

Defendant argues that some Plaintiffs identified particular managers as encouraging overtime work, but other Plaintiffs who were also supervised by those managers said it was different managers who encouraged them to work overtime. See Doc. No. [146], at 21 n.8. The court again finds that Defendant has taken too narrow a view of Plaintiffs' interrogatory responses. For example, in response to the interrogatory concerning who encouraged him to work overtime or knew that he was working overtime, Plaintiff Role did not state that only his supervisor Thomas encouraged overtime. Rather, Plaintiff Role stated that sales requirements were enforced by his managers and supervisors: Popov, Adewakun, and Thomas. See Doc. No. [146], Exh. 7, Part C, at 313-15. Furthermore, the fact that some Plaintiffs testified that none of their managers encouraged them to work overtime does not mean that those managers were not aware of the fact that those Plaintiffs worked overtime to meet their sales goals. See Doc. No. [146], at 25 n.10.

17

The court understands Defendant's position that some managers tracked employee hours on calendars and some did not; that some managers allowed employees to make up hours for late arrivals or early departures, while others did not; and that some managers utilized "early outs," a program that permitted employees who met certain sales goals to leave early on Friday. But these facts do not change the general instructions given to all inside sales representatives that they must work any necessary amount to meet their sales quotas.

Ultimately, what the court must consider on a motion to decertify is what kind of evidence will be presented at a trial. Would this be a case where the jury hears general testimony as to job description and recording of time with some individualized evidence as to how many hours a particular plaintiff worked? Or would this be a trial where the jury hears such general testimony, but it must also then sift through broad evidence of different factual circumstances as to each individual opt-in plaintiff? The more the case starts to look like 77 mini-trials, the more difficult the task becomes for the jury and the more prejudice Defendant may suffer. But just because there might be some individualized evidence at trial does not mean that the whole collective action must be decertified. Rather, the court must balance consideration of the efficiencies of trying the case as one with the inefficiencies of moving forward with 77 different cases likely tried among different

judges. Along in with this mix, the court must also address what are essentially due process concerns of Defendant.

Here, taking into consideration all of the facts and circumstances the parties have presented about the case thus far, the court finds that the similarities – same job responsibilities, same pay structure, across-the-board encouragement of overtime work to meet sales quotas, lack of any formal mechanism to track time, and lack of any paid overtime – outweigh the differences – statute of limitations, credibility, whether some managers might have been more lenient on compensatory time. Therefore, the court DENIES Defendant's motion for decertification [146].

Although the court has denied Defendant's motion for decertification, the parties apparently anticipate filing motions for summary judgment. It is possible that as the parties develop further evidence and potentially narrow liability issues, the court might have a different view of the suitability of a collective action. After resolution of any motions for summary judgment, if necessary, the court may require the parties to file trial briefs outlining the manner in which they intend to try/defend the case before the jury. See, e.g., Espenscheid v. DirectSat USA, LLC, 705 F.3d 770, 775-76 (7th Cir. 2013) (Posner, J.) (FLSA case); Vega v. T-Mobile USA, Inc., 564 F.3d 1256, 1278-79 & n. 20 (11th Cir. 2009) (Rule 23 class)

19

## III. Conclusion

The court DENIES Defendant's motion for decertification [146].

IT IS SO ORDERED this 5th day of August 2015.

_____
HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE